**AMERICAN AIRLINES, INC., Plaintiff,**

v.

**PLATINUM WORLD TRAVEL; Coupon Connection; Ernest W. Carlson; Bruce H. Briggs; Robert J. Baumann; and Randall Christensen, Defendants.**

**Civ. No. 88–C–770W.**

United States District Court, D. Utah, C.D.

July 12, 1989.

---

**7.** Plaintiff's certificate of registration purports that "Wednesday's Child" is the work that was copyrighted.

LeRoy S. Axland and Paul M. Simmons, Salt Lake City, Utah, and Richard A. Rothman and Bonnie Garone, New York City, for American Airlines, Inc.

Samuel Alba and M. David Eckersley, Salt Lake City, Utah, for Randall Christensen.

Scott R. Wangsgard and Kirk C. Bennett, West Valley City, Utah, for Platinum World Travel, Coupon Connection, Ernest W. Carlson, Bruce H. Briggs and Robert J. Baumann.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on all defendants' motions for summary judgment and on plaintiff's cross motion for summary judgment.[1] The court heard argument on these motions on March 10, 1989. Defendant Christensen was represented by Samuel Alba and M. David Eckersley. Defendants Platinum World Travel, Coupon Connection, Carlson, Briggs, and Baumann were represented by Scott R. Wangsgard. Plaintiff, American Airlines (AMERICAN), was represented by Richard A. Rothman, Bonnie Garone, Leroy S. Axland and Paul M. Simmons. Prior to the hearing, the court had reviewed carefully the memoranda submitted by the parties. After taking the matter under advisement,[2] the court has further considered the law and the facts and now renders the following memorandum decision and order.

## BACKGROUND

### I. *The AAdvantage Program.*[3]

Since 1981, AMERICAN has operated the "AAdvantage Program" for AMERICAN passengers who elect to participate. Generally, the AAdvantage Program provides travel awards, ranging from First Class upgrades to free round-trip tickets, based on the mileage credits a program member earns by flying AMERICAN or

---

**1.** The defendants also filed a motion to strike the DiNuzzo and Axland affidavits submitted by AMERICAN. As will be reflected in our decision, we have scrutinized the admissibility of all testimony and documents submitted to the court through these affidavits, and only rely on admissible facts. We do not believe it would serve any helpful purpose to step through each affidavit point-by-point and articulate our admissibility rulings. Generally, we find Mr. Di-Nuzzo qualified to testify to his knowledge about the AAdvantage Program, AMERICAN's intent in creating the program and specific program rules, and AMERICAN's understanding of tariff requirements. His legal conclusions are inadmissible and of no effect. With regard to the Axland affidavit, we seriously question the admissibility of unstipulated to testimony from other lawsuits inasmuch as this testimony is hearsay and we have not been cited to a rule of evidence or other authority which makes such testimony admissible. We note, however, that no challenge has been made to the authenticity of the other documents submitted by Axland.

**2.** After the hearing the defendants (except Christensen) moved to supplement their memorandum in opposition to plaintiff's motion for summary judgment and filed a supplementary memorandum with additional case law supporting their position. The plaintiff opposed the supplementary memorandum. We have reviewed the defendants' papers and find that they do not meet the criteria for proper supplementary materials. They appear to present entirely new arguments and case law that were available to the defendants and should have been presented within the original briefing period. We also note that to the extent that these arguments address the reasonableness of provisions of the international Tariff itself, administrative remedies are available and must be exhausted. *See Lichten v. Eastern Air Lines, Inc.,* 189 F.2d 939, 941 (2d Cir.1951). Accordingly we deny the motion to supplement and do not consider those arguments in ruling on these summary judgment motions.

**3.** This discussion is based on the January 1986 AAdvantage Program Rules Brochure ("ADVRB 1/86") supplied to the Court as Exhibit A to Mr. DiNuzzo's affidavit. Mr. DiNuzzo states that AMERICAN has changed the program rules over the years in an attempt to "curb the abuse of the program which unfortunately developed and has increased over time." DiNuzzo Affidavit at 3, ¶ 5. Thus, we infer that the AAdvantage Program transferability provisions may not be the same for the entire period involved in this lawsuit. The precise transferability language is critical to this case. For each alleged incident of coupon brokering which allegedly was a tortious interference with contract, AMERICAN must establish the applicable transferability language.

other designated foreign carriers between selected locations. AMERICAN keeps track of the member's mileage credits in the member's account. The mileage earned is generic. That is, there are not separate accounting systems for international mileage and domestic or overseas mileage earned. Increasingly valuable travel awards become available as the mileage credit total increases.[4]

The AAdvantage Program rules are primarily provided to program members in a Rules Brochure,[5] which describes the program, lists the various awards available, and contains provisions concerning program restrictions,[6] including transferability restrictions on the travel awards.[7]

## II. *The Lawsuit.*

AMERICAN complains that activities by some or all of the defendants since at least 1986 form the basis for several causes of action, to wit: (1) tortious interference with the AAdvantage program contract between the plaintiff and its AAdvantage program members; (2) tortious interference with the contract between the plaintiff and its travel agents; (3) tortious interference with the contract between the plaintiff and its potential full-fare passengers; (4) conspiracy to commit fraud and aiding and abetting fraud; (5) unfair competition; (6) violation of the Pattern of Unlawful Activity Act, Utah Code Ann. §§ 76–10–1601 *et seq.*; (7) RICO; and (8) injunctive relief.

AMERICAN alleges in its complaint that the defendants' activities underlying the first five causes of action generally involve

ticket brokering activities wherein the defendants pay AAdvantage members to request from AMERICAN and give to the defendants AAdvantage tickets made out for named individuals and destinations supplied to the member by the defendants. The defendants then sell these AAdvantage tickets either to the named individual, instructing him/her to tell AMERICAN that the AAdvantage ticket was a gift, or to a third party, instructing him/her to misrepresent his/her identity to AMERICAN and to say that the ticket was a gift. The defendants also allegedly induced AMERICAN's authorized travel agents to buy these purchased tickets from the defendants for resale to others. The defendants seek summary judgment against AMERICAN on these five counts, and count eight.

The defendants' activities underlying the sixth and seventh causes of action allegedly include the above-mentioned activities. In addition, however, AMERICAN alleges that the defendants purchased AAdvantage award certificates from persons who had stolen AMERICAN mileage credits from AMERICAN, and that the defendants knew the credits had been stolen or believed they had probably been stolen at the time they purchased the certificates. The defendants seek a Rule 9(b) dismissal of these two counts.

## III. *The Summary Judgment Motions.*

Two fundamental issues underlie the plaintiff's first five and eighth causes of action: (1) whether the AAdvantage Pro-

---

4. For instance, when a member has earned 10,-000 mileage credits, s/he is entitled to an upgrade to first class on an AMERICAN ticket for travel anywhere except to or from Europe and Hawaii, so long as the ticket does not have an advance purchase requirement, plus an upgrade on a rental car and accommodations. For 20,-000 miles, the member may choose among: a discount on an AMERICAN or American Eagle ticket for travel anywhere except to or from Europe; an upgrade from first class to Concorde on British Airways between Miami, New York or Washington, D.C., and London; an upgrade from Economy Class to Business Class on Singapore Airlines; and an upgrade from Economy Class to Business Class on Qantas Airways. In addition, the member receives price breaks on car rental and accommodations. DiNuzzo Affidavit, Exhibit A.

5. According to AMERICAN's complaint, members are given the Brochure outlining the program rules when they join, and the key rules in the Brochure related to transferability are "regularly restated" in additional materials sent to the members, including flight award certificates, earned mileage summaries, and newsletters.

6. For instance, ADVRB 1/86 indicates that some of the awards are subject to foreign government approval, and that the AAdvantage program and use of awards are subject to any applicable foreign laws. This Rules Brochure does not mention AMERICAN's tariff.

7. See discussion *infra* at 1464–65.

gram rules contained in AMERICAN's international tariff or the rules contained in the AAdvantage Program Rules Brochure govern the relationship between AMERICAN and its AAdvantage members; and (2) whether the defendants' alleged activities are in violation of the governing contractual provisions.

The defendants contend that because tariffs govern the relationship between an airline and its passengers, and because AMERICAN has only one AAdvantage Program for both domestic and international transportation, the rules found in AMERICAN's international tariff control the entire AAdvantage program. Further, they contend that the Tariff rules do not prohibit their actions.

The plaintiff asserts that the Tariff and the Rules Brochure are not in conflict, that the Rules Brochure supplements the Tariff, and that the Rules prohibit the defendant's activities. In the alternative, the plaintiff asserts that the predominantly domestic nature of the AAdvantage Program renders the Tariff inapplicable to it. Finally, the plaintiff asserts that if the Tariff is applicable, it prohibits the defendants' conduct.

### A. Summary Judgment Standard of Review.

The standard for this court to rule on summary judgment motions is set forth in Federal Rule of Civil Procedure 56(c). Summary judgment shall be granted when parties to a lawsuit do not dispute any material facts and judgment in favor of the moving party is appropriate as a matter of law. A moving party may demonstrate no material facts are disputed through "pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, demonstrates ... there is [no] evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S.

317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has carried this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553.[8] The non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

To be considered, the evidence must be admissible under the evidentiary standard that would be applied at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In considering a summary judgment motion, however, this court does not weigh the evidence but instead inquires whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511. To determine if sufficient evidence exists "the inferences to be drawn from the underlying facts [in the admissible record] ... must be viewed in the light most favorable to the [nonmoving] party." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (*quoting United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). Finally, any admissible facts asserted by the party opposing the motion that are not controverted must be regarded as true.

As will be seen infra, final resolution of this case requires development of the facts concerning each brokering incident in which the defendants allegedly interfered with the contractual relationship between AMERICAN and its AAdvantage members, potential customers, and travel agents.[9]

---

**8.** The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.*

**9.** AMERICAN alleges tortious certificate brokering incidents beginning in at least 1986 and

continuing thereafter. To establish an injury and damages the plaintiff will have to show for each brokering incident at least the nature of the travel award given, see *infra* at 1461–62, the applicable contractual rules, their violation by the defendants, and the amount of damages flowing therefrom. To obtain an injunction, the

These facts are not of record at this time. In a purely legal context, however, we can and will determine what categories of AAdvantage members are governed by AMERICAN's AAdvantage Program Rules Brochure, what categories are governed by AMERICAN's international tariff, and what those respective rules prohibit. Application of these legal principles must await further factual development.

## DISCUSSION OF THE LAW

### I. *Tariff Law.*

### A. *What Must Be in the Tariff.*

Regulated air carriers are required to file with the designated government agency [10] tariffs showing "all rates, fares, and charges for air transportation between points served by [the airline] ... and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation." 49 U.S.C. App. § 1373(a); 14 C.F.R. § 221.3(a). The domestic passenger airline industry, defined as "interstate" and "overseas" air transportation,[11] was deregulated January 1, 1983, 49 U.S.C.App. § 1551(a)(2)(A). Congress abolished the domestic tariff fil-

ing requirement and the Civil Aeronautics Board's (CAB) power to accept and review tariffs. *See* 49 U.S.C.App. § 1551(a)(2)(B) and *e.g. First Pennsylvania Bank v. Eastern Airlines, Inc.*, 731 F.2d 1113, 1120 (3d Cir.1984). The international air passenger industry remained regulated although the authority to review tariffs was transferred to the Department of Transportation on January 1, 1985.

The airline carrier regulations, now applicable only to foreign air transportation,[12] do not specifically address travel award programs. The regulations provide, however, that "no air carrier ... shall, in any manner or by any device, directly or indirectly ... extend to any person any privileges ... with respect to matters required by the Board to be in such tariffs, except those specified in such tariffs." 14 C.F.R. § 221.3(b). This regulatory language is broad enough to require the carrier to mention the awards program in the airline's tariff. The travel award program is a "device" which extends to the program member a "privilege" with respect to the rate paid for transportation, a "matter[ ] required by the Board to be in such tariffs."[13]

plaintiff will have to establish that the defendants' ongoing actions violate controlling contractual provisions and that a remedy at law is inadequate.

10. The Civil Aeronautics Board (CAB) was the designated agency until 1985, when Congress abolished the CAB and designated the Department of Transportation (DOT).

11. "Interstate air transportation" is defined as "the carriage by aircraft of persons or property as a common carrier for compensation or hire ... in commerce between ... a place in any State of the United States, or the District of Columbia, and a place in any other State of the United States, or the District of Columbia; or between places in the same State of the United States through the airspace over any place outside thereof; or between places in the same Territory or possession of the United States, or the District of Columbia...." 49 U.S.C.App. § 1301(21)(a).

"Overseas air transportation" is defined as "the carriage by aircraft of persons or property for compensation or hire ... in commerce between ... a place in any State of the United States, or the District of Columbia, and any

place in a Territory or possession of the United States; or between a place in a Territory or possession of the United States, and a place in any other Territory or possession of the United States...." 49 U.S.C.App. § 1301(21)(b).

12. "Foreign air transportation" is defined as "the carriage by aircraft of persons or property as a common carrier for compensation or hire ... in commerce between ... a place in any State of the United States, or the District of Columbia, and a place in any other State of the United States, or the District of Columbia; or between places in the same State of the United States through the airspace over any place outside thereof; or between places in the same Territory or possession of the United States, or the District of Columbia...." 49 U.S.C.App. § 1301(21)(a).

13. It could be argued that 14 C.F.R. § 223 entitled "Free and Reduced-rate Transportation" applies to the award program and does not require the inclusion of the award program in the tariff. Based on our review of that section, we do not believe it was intended to cover ongoing earned free-transportation programs for regular passengers like the one in the case at bar.

■ The airline carrier regulations also show that mere mention or surface explanation of the awards program is insufficient—a specific and comprehensive statement of the program rules is required. Regulation § 221.38(a) states that

the rules and regulations of each tariff shall contain:

(1) Such explanatory statements regarding the fares, rates, rules or other provisions contained in the tariff as may be necessary to remove all doubt as to their application.

(2) All of the terms, conditions, or other provisions which affect the rates, fares, or charges for air transportation named in the tariff.

(3) All the rates or charges for, and the provision governing, terminal services, and all other services which the carrier undertakes or holds out to perform on, for, or in connection with air transportation....

(4) All other provisions and charges which in any way increase or decrease the amount to be paid ... by any passenger, or which in any way increase or decrease the value of the services rendered to the ... passenger.

14 C.F.R. § 221.38(a).[14] Paragraph four, in particular, appears to require the inclusion in the tariff of any transferability restrictions on the travel awards. Such restrictions certainly "decrease the value of the services rendered" to the program member. Based on the foregoing, we conclude that AMERICAN's AAdvantage Program, to the extent it involves foreign transportation, is required to be set forth in AMERICAN's tariff.

**B. What Effect the Tariff is Given.**

■ We must now decide what effect AMERICAN's tariff is to be given.[15] A validly filed and approved tariff "exclusively and conclusively" controls the contractual relations between the parties. *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922); *Harby v. Saadeh*, 816 F.2d 436, 439 (9th Cir.1987); *Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403–04 (2d Cir.1969); *United States v. Associated Air Transport, Inc.*, 275 F.2d 827, 833 (5th Cir.1960); *North American Philips Corp. v. Emery Air Freight Corp.*, 432 F.Supp. 519, 522 (S.D.N.Y.1977), aff'd 579 F.2d 229 (2d Cir.1978); *Blair v. Delta Airlines*, 344 F.Supp. 360, 365 (S.D.Fla.1972), aff'd 477 F.2d 564 (5th Cir.1973); *Mao v. Eastern Air Lines Inc.*, 310 F.Supp. 844 (S.D.N.Y. 1970). "The rights as described by the tariff cannot be varied or enlarged by contract or tort of the carrier," *Keogh*, 260 U.S. at 163, 43 S.Ct. at 49, and the tariff "may not be added to through reference to outside contracts or agreements or understandings," *Clemente v. Philippine Airlines*, 614 F.Supp. 1196, 1199 (S.D.N.Y. 1985); *North American Philips*, 432 F.Supp. at 524; *Associated Air Transport*, 275 F.2d at 833.[16] Therefore, should the airline purport to make some other contract with the passenger and that contract is in conflict with the tariff, the tariff will control. *See Aero Trucking, Inc. v. Regal Tube Co.*, 594 F.2d 619, 622 (7th Cir.1979) (tariff allowing detention charges controls despite carrier agent telling shipper no detention charge would be assigned); *Clemente*, 614 F.Supp. at 1199 (tariff requiring 72 hour advance confirmation overrides carrier agent's contrary statement). This

---

**14.** That a full explanation is given in the tariff itself is further mandated in 14 C.F.R. § 221.100, which states that an airline tariff "shall not refer to nor provide that it is governed by any other ... document, or publication, or any part thereof...."

**15.** Tariff interpretation is generally a question of law. *Harby v. Saadeh*, 816 F.2d 436, 439 (9th Cir.1987); *Emery Air Freight Corp. v. United States*, 499 F.2d 1255, 1259, 205 Ct.Cl. 49 (1974); *Bella Boutique Corp. v. Viasa Airlines*, 459 So.2d 440 (D.Ct.Fla.1984).

**16.** Compare *Slick Airways, Inc. v. United States*, 292 F.2d 515, 520, 154 Ct.Cl. 417 (1961), in which the court allowed the tariff to be completed by reference to guides or standards outside the tariff because there was no law or regulation to the contrary. Similarly, 14 C.F.R. § 221.54 permits reference to other specific mileage or distance guides. 14 C.F.R. § 221.100(a), however, expressly prohibits any other outside references except to governing tariffs.

is true regardless of the passenger's lack of actual knowledge about the tariff provision, *see Harby,* 816 F.2d at 439; *Aero Trucking,* 594 F.2d at 622; *North American Philips,* 432 F.Supp. at 522; *Hycel v. American Airlines, Inc.,* 328 F.Supp. 190, 193 (S.D.Tex.1971); *Mao,* 310 F.Supp. at 846.

■ Because international air transportation is regulated, and international tariffs are required to be filed, these principles of tariff law apply to foreign air transportation. International tariffs do not, however, have any application to domestic air transportation.[17] Domestic air transportation is controlled by common law contract principles. In buying the ticket for domestic travel, the purchaser accepts and agrees to be bound by the terms and conditions of the contract of which the passenger is given actual notice. This unilateral contract is interpreted on its face without consideration of the intent of the maker, and ambiguities are construed against the maker.

## II. *AMERICAN's Travel Award Program.*

AMERICAN's AAdvantage Program is a program involving unilateral contracts. AMERICAN offers its passengers travel awards which they can accept only by complying with specific program "rules" AMERICAN has established.[18] For each separate travel award the passenger must meet AMERICAN's conditions of: having joined the program; having acquired the requisite mileage credits for that award by flying on AMERICAN; having properly filled out the award request form, properly designating the award recipient, the travel destination, and signing the form; and, having sent that form to AMERICAN.[19] Compliance with these "rules"[20] is the program member's acceptance of AMERICAN's offer of the travel award entitling the recipient to free or reduced-rate travel. By accepting, the member also agrees to be bound by additional terms AMERICAN imposes on the use of the award, including transferability limitations. If a travel award is issued to a member who has violated a condition for getting the award, or who violates a condition thereafter, the award is void.

■ The AAdvantage Program involves both domestic and foreign transportation, which arguably creates a problem because of the regulatory character of the airline industry. AMERICAN apparently wishes to have one set of rules govern the entire "program," and asserts that the AAdvantage Rules Brochure set is the official set. It appears to us, however, that there is no overriding need to apply one "set" of program rules to both the foreign and the domestic aspects of AMERICAN's AAdvantage program.[21] There is nothing mag-

---

**17.** This is not to say that a carrier could not incorporate international tariff terms into its domestic contract of carriage. To do so, however, the carrier would have to give the passenger actual notice of terms in the tariff. *See Neal v. Republic Airlines, Inc.,* 605 F.Supp. 1145, 1147 (N.D.Ill.1985) (post deregulation airbill which expressly referred to tariff rules and regulations made tariff controlling); *Ruston Gas Turbines v. Pan American World Airlines,* 757 F.2d 29, 32 (2d Cir.1985) (after deregulation carrier could use old tariffs as basis for contract).

**18.** That AMERICAN chooses to set forth the terms to govern these contracts in the Rules Brochure and gives these to the program members upon joining the "program" is immaterial. A bilateral contract is not formed because no promise is made by the member at that time. No contract is formed until the member accepts AMERICAN's offer through performance.

**19.** See "Claiming your AAdvantage awards," ADVRB 1/86 at 3–4, DiNuzzo Affidavit, Exhibit A.

**20.** And compliance with any other "rules" specifically set forth in the documents which control the contractual relations between that passenger and AMERICAN.

**21.** We disagree with the court's conclusion in *Northwest Airlines, Inc. v. World Connections,* Civ. No. 4–87–807 (Order filed August 26, 1988). We do not believe that inclusion of domestic travel rules in an international tariff, without more, enlarges the tariff's domain. The *Northwest* court's solution may be convenient, but we do not believe it accurately reflects the law.

We also disagree with the court's analysis in *Trans World Airlines v. American Coupon Exchange,* 682 F.Supp. 1476, 1481 (C.D.Cal.1988). That court summarily applied an international tariff to TWA's Frequent Flyer program without

ic about the "program" entity which would require this. The primary focus of the AAdvantage program is the individual travel award.[22] It is this travel award which economically competes with the tickets of other carriers.[23] Each separate award involves a separate unilateral contract under which various restrictions and conditions are attached to the award. If these conditions are breached, it is the particular award, not the program membership, which becomes void. Therefore, it is upon each travel award contract that we should focus, not upon an overriding "program" entity.

Focusing on the travel award itself, we can draw the following conclusions. Each award is clearly identifiable as one for foreign or domestic travel. If the award involves foreign air transportation,[24] its transferability will be controlled by the rules in AMERICAN's international tariff. If the award involves interstate or overseas air transportation, its transferability will be controlled by the applicable AAdvantage Rules Brochure. What those respective rules are is addressed below.

### III. *Interpretation of AMERICAN's Tariff.*[25]

AMERICAN's relevant international tariff went into effect July 1, 1985 and remains effective. Rule "& 715" of the tariff outlines the AAdvantage Program in four sections, A–D.[26] Section (A) is subtitled "Application";[27] Section (B) is subtitled "AAdvantage Bonuses";[28] Section (C) is subtitled "AAdvantage First Class Upgrade Program"; and Section (D) is entitled "AAdvantage Program Conditions and Mileage Accumulation."

 Although the precise bonuses available to the program member are stated in the tariff,[29] at no place in the tariff is

---

so much as mentioning the domestic versus international issue, perhaps because "the parties agreed that if the tariffs are valid in terms of public policy, they represent a binding agreement which would serve to bar the activities of [the coupon brokering company]."

**22.** Although both international and domestic miles can be combined to earn a travel award, clearly the travel award, not the mileage, is the item of value. It is the sale of this discount travel that AMERICAN seeks to prohibit.

**23.** This is true even though the ability to earn mileage credits on other AMERICAN flights increases the competitiveness of AMERICAN's rates on those flights. The "earn mileage credit" incentive only exists because the travel award exists.

**24.** The inclusion of domestic connecting flights in AMERICAN's otherwise foreign travel awards does not change their overall foreign character. Such domestic travel is foreign air transportation under both the "flow of commerce" and the "carrier-restricted" tests used by the CAB (and presumably still used by the DOT). See *Japan Air Lines Company, Ltd. v. Dole,* 801 F.2d 483 (D.C.Cir.1986), *cert. den.* 480 U.S. 917, 107 S.Ct. 1372, 94 L.Ed.2d 688 (1987), for a brief discussion of these tests in conjunction with the affirmance of the CAB's use of the latter test in its determination that a domestic carrier's discounted freight carriage rate, for carriage from Chicago to Seattle as long as that freight was ultimately headed for particular foreign destinations regardless of foreign carrier, involved "domestic transportation."

**25.** Transatlantic and Western Hemisphere Passenger Fares and Rules Tariff No. AA—1, C.T. C.(A) No. 273, ¶ C.A.B. No. 465 (attached to Christensen's memorandum supporting motion for summary judgment).

**26.** The Tariff sets forth the "AAdvantage Program" on pages AA–159 through AA–160–D. We have thoroughly reviewed those pages of the Tariff which are of record and traced whatever revisions were made in applicable language and the effective dates of those revisions.

**27.** From at least December 28, 1985 until the present, the entire Program set forth in the Tariff is stated to be "Applicable only for travel to/from the USA/Canada." Tariff at 159 (revs. 6–16).

**28.** The Tariff sets forth various travel awards available for mileage earned by members. *(B) AAdvantage Bonuses,* Tariff at AA–159 (revs. 6–16) through AA–160–C (original—rev. 4). The bonus provisions indicate the awards available when certain mileage levels have been attained. Most of the bonuses listed are for foreign transportation.

**29.** A few bonus awards stated in the Tariff appear to apply to purely domestic transportation. These are: (1) the "Hawaii Special First Class Upgrade" award in effect from 12/14/85 until 9/4/86, Tariff p. AA–160–A (original through 3rd revision); (2) the "Autumn 1986 Special" award in effect from 10/29/86 until 11/19/87, Tariff p. AA–160–A (5th through 7th revisions); and (3) the "AAdvantage First Class Upgrade" program in effect from 12/14/85 until the present.

the member informed of the exact procedure for claiming a travel award "bonus."[30] We do not believe that purely procedural rules are required by the regulations to be in the Tariff because they do not affect the economic value of the travel award. Therefore, reference outside of AMERICAN's tariff rules to the AAdvantage Program Rules Brochure is not improper. Those external procedural rules are part of the contract between AMERICAN and the member claiming a foreign travel award. In contrast, we do believe that rules on transferability must be stated in the tariff in order to be enforceable. Transferability significantly affects the value of the travel award.[31] Therefore, the transferability of foreign awards will be controlled solely by the provisions in AMERICAN's tariff.[32]

■ Since at least December 14, 1985 AMERICAN's tariff has contained only the following transferability restriction:

Bonuses will be made to the person under whose identification number the mileage has been accumulated or to another person designated by the account holder. Once a bonus has been made it cannot be transferred.

Tariff at p. AA–160–A (original through revisions) (emphasis added). Giving these words their ordinary meaning, this language is not ambiguous. The rules prohibit the transfer of the "bonus" *once it has been made.* Because the "bonus" is not "made" until after the account holder has requested that it be made either to that account holder or to a designated recipient, "bonus" must refer to the award certificate. Thus, the award certificate issued by AMERICAN is nontransferable. This language would also prohibit the transfer of the airline tickets for which the award certificate is exchanged.[33] To prohibit transfer of the certificate but allow transfer of the tickets is an unreasonable interpretation because it would render the former prohibition ineffectual.

AMERICAN's tariff does not prohibit, however, the effective transfer of the award which occurs when the account hold-

In keeping with our earlier discussion, these domestic awards, although listed in the Tariff, are governed by provisions in the Rules Brochure, not by Tariff provisions. We note, however, that the dispute in this case appears to involve "bonuses," not "upgrades." Both the "Hawaii" awards and the "Autumn 1986" awards are listed in the Tariff under the "(B) AAdvantage Bonuses" heading. The "First Class Upgrades" are listed under a separate heading ("(C)") of the same name.

30. The Tariff only provides the following relevant procedural instructions:

(A)(2) Each person who elects to participate in the AADVANTAGE PROGRAM will be assigned an Identification Number. Membership in the AADVANTAGE PROGRAM will not be activated until the first time this Identification Number is used in accordance with (D) below.
(B)(1) Each participant who has followed the procedures in (D) below for accumulation of mileage will receive, based on the amount of mileage accumulated, a bonus applicable for transportation as follows: [specific available bonuses listed].
(B)(3) Bonuses will be made to the person under whose identification number the mileage has been accumulated or to another person designated by the account holder. Once a bonus has been made it cannot be transferred.

(D)(1) An AADVANTAGE PROGRAM participant will be assigned an identification number which the passenger must mention either at the time reservations are made or at the time of check-in for boarding pass issuance.
(D)(2) The passenger is required to verify that the number is correctly noted on appropriate form.
(D)(3) When a bonus is claimed, the number of miles required to qualify for that bonus will be deducted from the participant's accumulated mileage.
(D)(4) All tickets for free AAdvantage award travel will be issued only at America [sic] Airlines ticketing locations, such as airport ticket offices and city ticket offices, and via American Airlines Tickets–By–Mail.

31. See discussion of applicable C.F.R. regulations, *supra* at 1459–60.

32. Contrary to AMERICAN's assertion that the Tariff and the Rules are not in conflict, we believe the absence of a limitation in the Tariff on the transfer of mileage credits through recipient designation does conflict with the presence of such a limitation in the Rules Brochure.

33. Thus, if the account holder designated, for payment or otherwise, "J. Jones" as the recipient, "J. Jones" can legally use the award certificate and the ticket, but he cannot sell, gift, or otherwise convey the award certificate or the ticket to "S. Smith" or to anyone else.

er designates an award recipient other than himself. In fact, this transfer is expressly permitted. An individual other than the account holder is permitted to be the award recipient—the only limitation is that the designation must be made "by the account holder," and not by some other individual. The language does not prohibit the account holder from accepting money in return for designating a particular individual.[34] It does prohibit, however, the member from signing the award request in blank and allowing someone else to designate the recipient. Such a designation by a third person would not satisfy the requirement that the designation be "by the account holder." [35]

Therefore, applying the Tariff transferability provision to the case at bar has the following result: for any AAdvantage travel award involving foreign transportation, a designation by the account holder on the request form of a specific award recipient, for value or otherwise, is not in violation of governing contractual provisions between AMERICAN and its AAdvantage program members. A transfer of the foreign transportation award certificate or tickets thereafter is a violation of the contract.

## IV. *Legal Interpretation of the AAdvantage Rules Brochure.*

 The plaintiff has placed in the record as an example of the AAdvantage Program rules, the January 1986 AAdvantage Rules Brochure ("ADVRB 1/86").[36] There is no evidence of record establishing the applicable timeframe of ADVRB 1/86.

Nor is there evidence that the transferability language in that Brochure is the same language as in subsequent Brochures. We infer, however, that ADVRB 1/86 is applicable to some of the travel awards made from 1986 until the present. Therefore, in the interest of expediency, we will interpret the transferability provisions contained in that Brochure.

ADVRB 1/86 contains three material provisions concerning transferability,[37] which we shall address individually. The first provision reads as follows:

[1] Award transfer requests should be made at the time an award is claimed. Once certificates are issued they are nontransferable.

ADVRB 1/86 at 3. This language is unambiguous. This provision prohibits the transfer of issued award certificates, and implicitly recognizes the ability to effectively transfer the award prior to certificate issuance.

The second provision prohibits the transfer for value of "mileage credits" and "travel awards." It states:

[2] At no time may AAdvantage mileage credit or travel awards be purchased, sold or bartered. Any such awards are void if transferred for cash or other consideration.

*Id.* at 11. We can perceive of only one way material to this action that an account holder can in effect "transfer" mileage credits.[38] The account holder can designate

---

**34.** Therefore, if the member is paid to designate "Jones" and does designate Jones, the award to Jones will be valid.

**35.** This interpretation is not per se unreasonable. It permits the account holder to receive the benefit of the earned mileage. The account holder may benefit through personal travel, or through gifting the travel to a friend, or through exchanging the travel in a private transaction for something of greater value to the account holder. The primary benefit of the award goes to the account holder. The secondary market effects are limited because the travel award can only be used by the person designated by the account holder. The designee cannot resell that ticket for profit.

**36.** DiNuzzo Affidavit, Exhibit A.

**37.** AMERICAN points to only the latter two provisions addressed here. We believe that all three are material to the case at bar.

**38.** We perceive of one other type of mileage credit "transfer" which could be accomplished by an account holder without unauthorized access into the AMERICAN maintained member accounts. This situation would involve the flight passenger on a regular flight giving someone else's account number to the AMERICAN agent for mileage credit. This situation does not appear to be involved in this lawsuit, however, and is prohibited specifically by a Brochure Rule stating "Only AAdvantage members may accrue mileage; mileage will be credited only to the account of the AAdvantage member who actually flies. Mileage credit is not transferable and may not be combined among AAd-

another individual as the recipient of the award that is based on those mileage credits. Such a designation, if made for value, is in violation of the Brochure Rules. The same rule applies to the transfer of "travel awards." Here, "travel award" appears to refer to the award certificate as well as the flight ticket issued in exchange for the certificate. Such transfers made for value are also expressly prohibited.

The third provision reads:

[3] Subject to the rules prohibiting purchase, sale and barter of AAdvantage mileage and travel awards, regular AAdvantage travel awards may be issued in any name designated by the AAdvantage member at the time of issuance; thereafter, the awards may not be transferred.

*Id.* This provision recognizes the account member's limited right to transfer mileage credits by designating an award recipient, so long as the designation is not made for value. The account holder's designation is "Subject to the rules prohibiting purchase, sale and barter of AAdvantage mileage and travel awards...." The language also reiterates the limitation of the first provisions that issued awards may not be transferred at all, neither for value nor as a gift.

The effect of these three provisions on the case at bar is that for any AAdvantage travel award for domestic transportation, the only permissible transfer of the travel award is the gifting of the mileage credits through the account member's designation of the award recipient at the award request stage. All transfers for value are prohibited, as are transfers of any kind after the award certificate has been issued.

## FACTUAL DISCUSSION AND RULING

With the legal principles established, their specific application to the motions at hand is in order. Summary judgment requires that the material facts be undisputed and that judgment be appropriate as a matter of law. Many of the same material facts underlie Counts I through V, and VIII, and either are in dispute or have not been developed.

▪▪▪ These material facts include, for Counts I and III,[39] the nature of each travel award underlying each alleged interference with contract; what Rules Brochure was applicable to each domestic travel award allegedly "brokered"; and precisely what the defendant's alleged "travel brokering" activity consisted of for each travel award at issue.[40]

For Count II, the material facts in dispute or not of record include, the existence of and provisions of the alleged contract

---

vantage members." DiNuzzo Affidavit, Exhibit A.

**39.** The defendants have also argued that if AMERICAN's program is a unilateral contract its claim for intentional interference cannot be maintained. We disagree. Utah law recognizes tortious interference claims for existing contracts and for prospective economic relations. The prima facie elements of these claims differ slightly, *see Jones v. Intermountain Power Project,* 794 F.2d 546, 554 (10th Cir.1986) (citing *Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 302 and 304 (Utah 1982)). If in fact the defendants' alleged "interference" with AMERICAN's AAdvantage members can be said to have occurred prior to the formation of the unilateral contract, AMERICAN's claim may be tenable as one for interference with prospective relations rather than existing contract.

**40.** AMERICAN has alleged in its complaint specific brokering activities by the defendants. In support of AMERICAN's position, Mr. DiNuzzo testifies in his affidavit that the defendants have "induced AAdvantage members to have American issue bonus award certificates in names of people to whom defendants have pre-sold the certificates and to conceal from AMERICAN that a sale has taken place," DiNuzzo Affidavit at ¶ 10, and that "the bonus certificate—or the conditional right to receive it—ordinarily is what defendants buy from AAdvantage members and sell to their customers." DiNuzzo Affidavit ¶ 20.

In their answers, the defendants have denied the specific activities alleged by AMERICAN. They admit generally that they are "engaged in the business of brokering travel," and acknowledge that the "we buy frequent flyer awards," Complaint Exhibit A, originated with them, but assert it speaks for itself. This answer places the precise nature of the alleged brokering activities in dispute.

DiNuzzo's testimony is inadmissible because it lacks sufficient foundation. Therefore, the defendants are not required to go beyond their answer to counter his testimony. The precise nature of the brokering activities allegedly involved remains in dispute.

between AMERICAN and its travel agents; the precise activities allegedly undertaken by the defendants with regard to the travel agents; the defendants' mental state; and whether the defendant's conduct was justifiable.

AMERICAN's Counts IV and V and VIII suffer from the same factual deficiencies as Counts I, II and III.

Accordingly, the court denies the defendants' motions for summary judgment on Counts I through V and Count VIII of the plaintiff's complaint. The court also denies the plaintiff's cross-motion for summary judgment on Count I.

## MOTIONS TO DISMISS

All defendants have moved to dismiss under Fed.R.Civ.Pro. 9(b) AMERICAN's RICO claim and Pattern of Unlawful Activity Act (PUAA) claim, Utah Code Ann. §§ 76–10–1601 et seq., on the ground that they are not pled with sufficient particularity. In addition, defendant Christensen has moved under Rule 9(b) to dismiss AMERICAN's conspiracy to commit fraud claim, Count IV, on the assertion that the complaint "does not allege that Christesen's [sic] alleged activity was in any way connected to the fraud complained of." Christensen Memorandum in support at 14.

█ Federal Rules 8 and 9(b) must be read together. A plaintiff is required to set forth a short and plain statement of the claim for relief which is complete enough to give sufficient notice to the defendants to enable the defendants to prepare a responsive pleading. *See Seattle–First Nat. Bank v. Carlstedt,* 800 F.2d 1008, 1011 (10th Cir.1986); *Cook v. Zions First Nat. Bank,* 645 F.Supp. 423, 424 (D.Utah 1986); *Dahl v. Gardner,* 583 F.Supp. 1262, 1267 (D.Utah 1984). This standard is somewhat lenient and takes into account the realities of particular fact situations. *See Grant v. Union Bank,* 629 F.Supp. 570, 576 (D.Utah 1986). This standard applies to RICO, PUAA and fraud claims.

█ Under this standard AMERICAN has adequately set forth its claims against all the defendants. The complaint alleges the individuals' connections to the defendant corporations and alleges fraudulent activities by the defendants, "individually and in combination and conspiracy between and among themselves and sometimes acting through the controlled Entities." The alleged fraudulent activities are sufficiently detailed to inform all defendants of the issues at bar and enable them to adequately respond in their defense. The defendants' motions to dismiss are denied.

Accordingly,

IT IS HEREBY ORDERED as follows:

1. The defendants' motions for summary judgment are denied.

2. The plaintiff's cross-motion for summary judgment is denied.

3. The defendants' motions to dismiss are denied.

4. This case is referred to the magistrate for a scheduling conference.

5. This order will suffice as the court's ruling on these motions and no further order need be prepared by counsel.