ENTERTAINMENT PUBLICATIONS, INC., Plaintiff,

v.

Robert S. GOODMAN, an individual, Pinnacle Enterprises Corp., a Massachusetts corporation, David S. Sigal, an individual, Alan Kawadler, an individual, and John Does 1–100,[1] Defendants.

No. Civ.A. 98–11689–WGY.

United States District Court, D. Massachusetts.

Oct. 4, 1999.

---

1. This case has been settled with respect to all defendants other than David S. Sigal, and is accordingly dismissed as to them.

Shepard M. Remis, Margaret A. Crouse, Goodwin, Procter & Hoar, Boston, MA, for Entertainment Publications, Inc., plaintiff.

Arthur M. White, Bikofsky & White, Framingham, MA, for Robert S., defendant.

Rodney E. Gould, Rubin, Hay & Gould, Framingham, MA, Barry Roberts, Roberts & Hundertmark, Chevy Chase, MD, for David S. Sigal, defendant.

Richard E. Gentilli, Bartlett, Hackett, Feinberg, Gentilli, Boston, MA, for Alan Kawadler, defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

While the laws of supply and demand are widely regarded as immutable and inexorable, their smooth and effective operation depends in large measure on brokers who match sellers and buyers in myriad ways. This case concerns a broker who has run amok.

Among other activities, the plaintiff here, Entertainment Publications, Inc. ("Entertainment"), prepares and distributes books of discount coupons to corporations as promotional giveaways and to charitable organizations which sell them to consumers who can use the coupons to obtain various discounts on certain goods and services. Both Entertainment and the recipient organizations earn a small profit on such consumer sales. In turn, the entities which supply the discount coupons do so as a marketing device in order to place their goods and services before individual consumers who, by purchasing the discount coupon book, have indicated a willingness to buy. One of the more attractive discounts was provided by Continental Airlines, Inc. ("Continental"), which issued to Entertainment a coupon for reduced fare air travel on Continental. It was essential to Continental's marketing strategy that its coupon get into the hands of a prospective purchaser who had indicated a willingness to buy. Accordingly, Continental's contract with Entertainment prohibited any resale other than to entities who would put the books in the hands of the ultimate consumer, Entertainment's form contracts with the distributing entities contained like restrictions, and Entertainment's coupon books themselves—and the Continental discount coupon in particular—prohibited transfer of the coupon book or the Continental discount coupon. The enforcibility of these provisions is at the heart of this case.

Enter the defendant David S. Sigal ("Sigal"), a "travel consultant" whose business consists of reselling discount airline coupons (in direct contravention of the terms printed thereon) to travel agencies specializing in reduced fare air travel. Sigal began to find his niche in 1992. During that year, Sigal spoke to an Entertainment employee named "Dennis" and inquired about purchasing airline coupons for resale.

"We have excess books," said Dennis. "We're looking to get some revenue from these books."

The excess books, that is, the books returned unsold by the charitable organizations, were sold to Sigal. Sigal next spoke with "Arnie," an Entertainment employee in its San Francisco office, and repeated the same process. Arnie introduced Sigal to a third Entertainment employee named Ron Steel. Steel set up with Sigal a timetable for the purchase of excess coupon books. Steel also warned Sigal not to sell the airline coupons in such books to certain travel agencies.

By August, 1993, Sigal's expanding business brought him into contact with the following Entertainment employees, from all of whom he solicited discount airline coupons or the Entertainment books in which they were found: "Greg" in Salt Lake City; "Carl" in Minneapolis; Ben Johnson in Seattle; and "John" in Kansas City who had no excess books for sale but who referred Sigal to Entertainment's Phoenix office to see if he could make a purchase.

By 1994, however, Entertainment—under pressure from the airlines with which it dealt—began tightening up its own internal procedures. Ron Steel, who had been promoted in the meantime, now told Sigal to purchase excess coupon books only from Entertainment's higher level "distributors." Significantly, Steel never told Sigal he could not resell the coupons to travel agencies apart from those certain agencies that Steel identified earlier.

Nevertheless, Sigal well knew by 1994 that the resale of the discount airline coupons was contrary to the written terms in the coupon books and on the coupons themselves. The resale of discount airline coupons was proving quite lucrative to Sigal, however, and with his supply drying up while demand kept ever growing, he went underground and began buying coupon books surreptitiously, using third parties as intermediaries to disguise the fact that he was the ultimate purchaser. Demand for Sigal's services continued to mount among discount travel agencies. In 1997, Sigal grossed approximately $147,-000.00 from his "business" of reselling discount airline coupons to travel agencies who were now pre-selling discounted seats on Continental in reliance on Sigal's efforts. Among the agencies that purchased discount coupons from Sigal during this period were Travel Discounters of Maryland, Air for Less, Call Jaws—defendant in a very similar case, see *Continental Airlines, Inc. v. Weiner*, CV 99–10334–DT, order denying motion to dismiss (C.D.Cal., March 29, 1999),—Cheap Seats, C.L. Thompson, and Travel Associates in Los Angeles, and the Joseph Stephens Group in San Diego.

Sigal's undercover activities were ultimately revealed in July, 1997, when he engaged in a clandestine agreement with the defendants Goodman and Kawadler to obtain nearly 6,000 discount coupon books which Entertainment thought were destined for an insurance seminar. Instead, the actual destination was revealed when an alert motel manager called the police because he suspected wrongdoing arising out of a number of teenage boys congregating in one of his motel rooms. When a police officer investigated, she found the boys busily extracting the Continental coupons from the Entertainment coupon books and bagging them for resale while watching a pornographic movie ordered for them by Sigal.

The notoriety of this event came to Entertainment's attention and, prodded by Continental, it brought this action in which it now seeks only permanent injunctive relief against Sigal's further resale of its coupon books or any of the Continental coupons.

Sigal makes no real attempt to dispute these findings, instead arguing that the Continental–Entertainment agreement is an illegal restraint on alienation and violates federal statutes and regulations regarding air commerce and safety.

The restraint on alienation argument is next to frivolous. This Court has little hesitancy in ruling that, unless otherwise illegal, the contractual terms may be enforced against those who interfere with the mutually advantageous contractual relationship between Continental and Entertainment.

In a final effort to escape liability, however, Sigal argues that the contract is unenforceable because it is illegal. This argument is far from frivolous.

██ A contract that violates state or federal law is void and unenforceable as against public policy. *See, e.g., Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982); *Kiely v. Raytheon Co.*, 105 F.3d 734, 736 (1st Cir. 1997). The burden of establishing illegality is on the defendant. *See Town Planning & Eng'g Assoc. Inc. v. Amesbury Specialty Co. Inc.*, 369 Mass. 737, 744, 342 N.E.2d 706 (1976).

██ The threshold issue in an illegality analysis is whether the contract calls for illegal conduct. *See Kaiser Steel*, 455 U.S. at 83, 102 S.Ct. 851; *Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc.*, 42 Mass.App.Ct. 162, 175, 675 N.E.2d 403 (1997). Illegality per se, however, does not automatically render the contract unenforceable. *See Starr v. J. Abrams Constr. Co. Inc.*, 16 Mass.App.Ct. 74, 78–79, 448 N.E.2d 1311 (1983). Rather, the Court must determine whether recovery may be had upon the illegal contract in light of all relevant circumstances. *See*

2. Federal regulations have the force and effect of law. *See, e.g., Paul v. United States*, 371 U.S. 245, 255, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963).

3. Although Congress deregulated the domestic air travel industry on January 1, 1983, the foreign air travel industry remains under the regulatory control of the Department of Transportation ("DOT").

4. The "other information" required by regulation includes: (1) All of the terms, conditions, or other provisions which affect the rates, fares, or charges for air transportation named in the tariff, *see* 14 C.F.R. § 221.38(a)(2)

*United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); *Town Planning & Eng'g Assoc.*, 369 Mass. at 745, 342 N.E.2d 706.

Sigal contends that the contract violates federal statutes and regulations regarding air commerce and safety.[2] The statutory framework, 49 U.S.C. § § 40101–46316 (1998), requires air carriers to file with the Secretary of Transportation ("the Secretary") and keep open to the public "tariffs showing the prices for foreign air transportation. . . ." 49 U.S.C. § 41504(a).[3] In addition to price information, the tariff must contain "other information the Secretary requires by regulation." *Id.* at § 41504(a)(1)(C).[4] The Secretary may reject a tariff that is inconsistent with these requirements. *See id.* at § 41504(c). A tariff that has been rejected is void. *See id.*

After filing tariffs, an air carrier must maintain prices and policies consistent with the information contained in the tariffs. The carrier may not:

(1) charge or receive compensation for foreign air transportation that is different from the price specified in the tariff of the carrier that is in effect for that transportation;

(2) refund or remit any part of the price specified in the tariff; or

(3) extend to any person a privilege or facility, related to a matter required by the Secretary of Transportation to be

(1998); and (2) all other provisions and charges which in any way increase or decrease the amount to be paid on any shipment or by any passenger, or which in any way increase or decrease the value of the services rendered to the shipper or passenger, *see id.* § 221.38(a)(4). Subsequent to the events of this case, DOT significantly revised these regulations. *See* Exemptions From Passenger Tariff–Filing Requirements in Certain Instances, July 27, 1999, 64 F.R. 40654. References to the Code of Federal Regulations in this order are to the version of regulating in force prior to September 10, 1999.

specified in a tariff for foreign air transportation, except as specified in the tariff.

*Id.* at § 41510(a).[5]

■ The Continental coupons at issue in this case provide discounts to passengers for both domestic and international travel. Thus, as Sigal argues, the coupon program must conform to the tariff requirements for foreign air travel as set forth in 49 U.S.C. §§ 41504 & 41510 and 14 C.F.R. §§ 221.3 & 221.38. This Court agrees with Sigal that the coupons, insofar as they relate to foreign air travel, are subject to the tariff requirements. In *American Airlines, Inc. v. Platinum World Travel,* 717 F.Supp. 1454 (D.Utah 1989), a federal district court considered whether a frequent flyer program that allowed passengers to redeem miles for domestic or foreign air travel rewards fell within the statutory and regulatory framework discussed above. The court answered in the affirmative, noting that the frequent flyer program "is a 'device' which extends to the program member a 'privilege' with respect to the rate paid for transportation, a 'matter [ ] required by the Board to be in such tariffs.'" *Id.* at 1459.[6]

■ Entertainment contends that the Continental coupons are not subject to the tariff requirements because they are nei-

ther "prices" nor "privileges." This Court need not decide whether a coupon is in fact a price or a privilege because a tariff also must contain "other information the Secretary requires by regulation." 49 U.S.C. § 41504(a)(1)(C). Such information includes "the terms, conditions, or other provisions which affect the rates, fares, or charges for air transportation named in the tariff," 14 C.F.R. § 221.38(a)(2), and "all other provisions and charges which in any way increase or decrease the amount to be paid on any shipment or by any passenger, or which in any way increase or decrease the value of the services rendered to the shipper or passenger," *id.* § 221.38(a)(4). This Court concludes that the coupons should be included in Continental's tariff because they affect the rates, fares, or charges in the tariff and decrease the amount paid by a passenger. *See id.*

Assuming then that the coupons should be included in the tariff, the Court now must examine exactly what the Continental tariff includes and whether Continental has adhered to its tariff as required by 49 U.S.C. § 41510(a). Unfortunately, Sigal has not presented this Court with evidence sufficient to make this determination. His illegality defense relies solely on his statement that he "is not aware of any tariff

**5.** The applicable regulations further provide that:

> No air carrier or foreign air carrier shall charge or demand or collect or receive a greater or less or different compensation for air transportation or for any service in connection therewith, than the rates, fares and charges specified in its currently effective tariffs; and no air carrier or foreign air carrier shall, in any manner or by any device, directly or indirectly, or through any agent or broker, or otherwise, refund or remit any portion of the rates, fares, or charges so specified, or extend to any person any privileges or facilities, with respect to matters required by the Board to be specified in such tariffs, except those specified in such tariffs.

14 C.F.R. § 221.3(b).

**6.** Subsequent to the *American Airlines* opinion, DOT issued an order stating that it has

never required carriers to file frequent flyer rules for approval as tariffs. *See* DOT Order 89–9–25, September 13, 1989, at 4, *quoted in American Airlines, Inc. v. Platinum World Travel,* 737 F.Supp. 627, 628–29 (D.Utah 1990) (modifying its earlier opinion to conform to the DOT order). That order, however, does not prevent this Court from concluding that the coupons ought be included in the tariff. First, the DOT order applies only to frequent flyer programs, not to other kinds of discounts. If the DOT intended to disqualify coupons from its tariff regulations, it easily could have issued an order to that effect. Second, the DOT order only exempted from tariff requirements the rules governing the frequent flyer program, such as the conditions for eligibility and restrictions on redemption; the award bonuses themselves still must be filed in the tariff. *See American Airlines,* 737 F.Supp. at 628–29.

containing" information about the coupons. Def.Mem. at 5. This statement, without more, does not fulfill Sigal's burden of proof. *See Fedenyszen v. Pollano,* No. 9413 1997 WL 382114, at *1–2 (Mass.App. Div. June 25, 1997) (rejecting defendant's illegality defense when he failed to assert at trial facts sufficient to show that a promissory note was illegal). Without evidence of the tariff's contents, this Court cannot conclude by a preponderance of the evidence that the tariff fails to include the coupon program, and thus it cannot conclude that the tariff violates a federal statute or regulation. Accordingly, this Court rejects Sigal's affirmative defense of illegality.

■ Because Sigal has not shown that the coupon program is illegal, this Court need not decide whether, in light of all circumstances, any or all of the contract may be enforced despite the alleged illegality. The Court pauses to note that even if Sigal could have shown that Continental's tariff violates federal law, that violation would not compel the Court to void the contractual relationship that has arisen between Sigal and Entertainment due to Sigal's false pretenses.

The rationale behind the illegality defense is twofold. The first is romantic: "no polluted hand shall touch the pure fountains of justice." *Collins v. Blantern,* 95 Eng.Rep. 850, 852 (K.B.1767), *cited in* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 22–1, at 888 & n. 14 (3d ed.1987). The second is punitive: courts will not "lend their aid to relieve parties from the results of *their own illegal adventures." Tocci v. Lembo,* 325 Mass. 707, 710, 92 N.E.2d 254 (1950) (emphasis added); *accord In re Sanborn, Inc.,* 216 B.R. 697, 700 (Bankr.D.Mass.1998) (noting that Massachusetts courts refuse to "relieve either party from the consequences of *his own violation of law."*) (emphasis added).

In this case, any violation of the relevant statutes and regulations must be attributed to Continental, not Entertainment or Sigal. As Sigal has repeatedly mentioned, Continental is not a party to this case. *See* Def.Mem. at 4; Def. Proposed Stipulations of Fact ¶ 17; Def.Rep.Mem. at 1–3. If this Court were to refuse to enforce Entertainment's rights with respect to Sigal, neither purpose of the illegality defense would be served. First, Continental's allegedly "polluted hand" does not reach out to this Court. Second, refusing to enforce Entertainment's rights would punish Entertainment rather than Continental, the alleged law breaker. This would simply give Sigal a windfall.

Because this Court cannot rule by a preponderance of the evidence that the Continental coupons violate federal law, and because such violations would not require this Court to deny Entertainment relief even if the Continental–Entertainment contract were illegal, Sigal cannot avoid liability on the basis of the affirmative defense of illegality.

■ Nevertheless, the Court declines to impose injunctive relief, as there remains an adequate remedy at law against Sigal for either breach of contract or tortious interference with advantageous contractual relations. The fact that Entertainment currently eschews such relief does not entitle it to an injunction.

Instead, the Court will administratively close this case, retaining jurisdiction should Sigal revert to his former ways, in which case these findings will serve as a foundation for prompt relief.