LORRAINE STARR vs. J. ABRAMS CONSTRUCTION CO., INC.
(and a companion case).

Suffolk.   April 11, 1983. — May 23, 1983.

Present: GREANEY, CUTTER, & PERRETTA, JJ.

*Contract,* Validity.  *Public Policy.  Arbitration,* Authority of arbitrator.
  *Mortgage,* Real property, Federal insurance.

This court let stand an arbitral award to enforce an oral "side agreement"
  providing for additional payments to supplement those required under
  a written building contract, notwithstanding possible illegality of the
  oral agreement by reason of the contractor's failure to disclose its ex-
  istence to the Federal agency insuring the mortgage on the project,
  where the parties appeared equally at fault in misleading Federal
  authorities as to the construction costs and where, in the circumstanc-
  es, the nondisclosure was not so detrimental to Federal policy respect-
  ing mortgage insurance as to warrant the imposition of sanctions addi-
  tional to those provided by criminal statutes.  [78-82]

CIVIL ACTIONS commenced in the Superior Court Depart-
ment on March 8 and March 26, 1982, respectively.
    The cases were heard by *Ford,* J.
    *Alan R. Hoffman* for Lorraine Starr.
    *Brian M. Hurley* for J. Abrams Construction Co., Inc.
    GREANEY, J.  We deal here with an arbitration award of
$66,856 on an oral side agreement to a written contract.
Under the written contract, the appellee, J. Abrams Con-
struction Co., Inc. (Abrams Construction), had undertaken
to build a nursing home for the appellant, Lorraine Starr.
In separate actions filed in the Superior Court, Abrams
Construction moved to confirm the award of the arbitration
panel, see G. L. c. 251, §§ 11 & 15, which, without making
findings of fact, granted the full amount Abrams Construc-
tion had sought under the side agreement; Starr moved,
pursuant to G. L. c. 251, §§ 12(a)(3) & 15, to vacate the

award. Abrams Construction's motion to confirm was allowed; Starr's motion to vacate was denied. Separate judgments reflecting these orders were entered. The cases are consolidated here.

The oral agreement essentially called for Starr to pay for anticipated costs of completing work on the nursing home in excess of the $1,710,000 contract price. The mortgage on the home is insured by the Federal Housing Administration (FHA). Starr asserts that enforcement of the agreement exceeds the powers of the arbitrators because the agreement is against public policy. This claim rests on the assertion that Abrams Construction made a false statement which had the effect of representing to the FHA that the project would be built for the contract price, thereby inducing FHA financing arrangements predicated on that figure, although the company's principals were aware that the contract sum would be insufficient to complete the desired facility. This course of conduct, it is asserted, violates 18 U.S.C. § 1010 (1976)[1] and G. L. c. 266, §§ 30, 33 & 34,[2] and the Federal regulatory scheme underlying FHA financing commitments. It is contended that enforcement of the side agreement would condone this illegal conduct and violate public policy.

There was evidence before the arbitrators from which they could have concluded the following facts. The $1,710,000

---

[1] This statute provides: "Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Department, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be fined not more than $5,000 or imprisoned not more than two years, or both."

[2] Larceny and larceny by false pretenses.

construction cost figure was reached at an August 8, 1975, meeting of Julius Abrams, president of Abrams Construction, Larry Smith and Henry Fitzgerald. Smith was the developer hired by Starr to handle the design, construction and financing of the project. Fitzgerald was the project's architect. At an October 6, 1975, meeting, which was likewise attended by Abrams, Smith and Fitzgerald, there was a discussion of changes which would have the net effect of adding some $50,000 to the cost. Smith told Abrams that the $1,710,000 figure had been established as the basis of financing arrangements with the FHA and that the figure was "sacred" and untouchable. Everyone agreed that an attempt would be made to do the job for that amount, but that if the net effect of changes, deletions and items which had not previously been figured into the computation forced the cost over $1,710,000 the excess would be paid by the owner. Starr attended a meeting on October 14, 1975, with these same individuals. It was agreed at the meeting that after the job was completed Abrams would calculate the value of any work which exceeded the "sacred" amount, and Starr would give Abrams Construction notes (on rather indefinite payment terms) for the appropriate sum at no interest. Starr also attended meetings on December 19, 1975, and June 9, 1976, at which this payment plan was confirmed. Throughout this period (and indeed up until construction began) the plans and specifications for the nursing home were in constant flux as was the estimate of the cost overrun, a situation not unusual in private sector construction. Despite this, a construction contract was signed on November 10, 1975, in order to lock in a favorable sales tax rate and to exempt the project from new safety regulations scheduled to become effective in 1976.[3] The contract recited

[3] A second contract was executed on an FHA form on June 1, 1976, also reciting a $1,710,000 contract amount. Parol evidence issues raised by reason of the respective dates of the contracts and the discussions which formed the oral side agreement were before the arbitrators and implicitly decided against Starr. Absent fraud, not asserted here, the arbitrators' determination of such issues must stand, notwithstanding errors of fact

the $1,710,000 cost figure. Construction began on June 14, 1976, approximately two months prior to the FHA closing.

Starr's allegations of illegality focus on FHA form no. 2328, which was executed by Abrams for Abrams Construction on March 31, 1976, and by Starr as mortgagor on April 5, 1976. That form is headed "Contractor's and/or Mortgagor's Cost Breakdown," and it contains the following inscription: "This form represents the Contractors [*sic*] and/or Mortgagors [*sic*] firm costs and services as a basis for disbursing dollar amounts when insured advances are requested." On the form, construction costs are broken down by category. The total cost reported was $1,710,000. It is not disputed that at all times, from and including the dates on which the form was signed, cost overruns of varying proportions were projected and that at the time of the final requisition for payment, which was based on the form no. 2328 figures, the amount of the overrun had crystallized at $66,582. Yet at no time was any attempt made to amend the original contract figure of $1,710,000 which was used in the completion of all official FHA documents, including the final requisition. Abrams testified that revision of the "sacred" figure was rejected because everyone involved knew that such a revision would result in having to start the project over again "from stage one." The decision to handle the extra costs outside of FHA channels was made, he said, in order to allow the project, already in gestation for a number of years, to proceed apace. As previously indicated, Starr asserts that this conduct violated 18 U.S.C. § 1010 (1976) (see note 1, *supra*), which punishes those who knowingly make false statements for the purpose of obtaining a loan to be insured by the Department of Housing and Urban Development (of which the FHA is a part) or for the purpose of influencing that department in any way. A violation of State criminal statutes punishing larceny by false pretenses, G. L. c. 266, §§ 30, 33 & 34, is also alleged.

---

or law made in arriving at the decision. *Trustees of Boston & Me. Corp.* v. *Massachusetts Bay Transp. Authy.,* 363 Mass. 386, 390-391 (1973). *Lawrence* v. *Falzarano,* 380 Mass. 18, 27 (1980).

It is *not* contended that the agreement to pay for the over-run is illegal, per se, nor do we think it could be. We are aware of no law which expressly forbids the performance of a contract to pay for construction costs which exceed the figure used as a basis for obtaining financing, federally insured or not. The issue, therefore, is whether the failure to disclose the oral side agreement to the FHA is so repugnant to public policy that a court should add to any potential liability under criminal statutes[4] the additional sanction of vacating an arbitration award which enforces the agreement. Assuming, without deciding, that the nondisclosure was illegal and, a fortiori, a violation of public policy, we conclude, with some hesitation, that the decision in *Town Planning & Engr. Associates* v. *Amesbury Specialty Co.*, 369 Mass. 737, 746 (1976), causes us to enforce the arbitrators' award.

There is a rule that "[a]rbitration . . . may not 'award relief of a nature which offends public policy or which directs or requires a result contrary to express statutory provision.'" *Lawrence* v. *Falzarano*, 380 Mass. 18, 28 (1980), quoting Eager, The Arbitration Contract and Proceedings § 121(6), at 316 (1971). That rule, however, is subject to the recognized qualification that "an award of arbitrators is valid and sustainable if there may be a lawful compliance therewith on any rational basis." Eager, *supra* at 316. We believe that a rational basis exists for enforcing the arbitration award on this oral agreement. "Our cases warn against the sentimental fallacy of piling on sanctions unthinkingly once an illegality is found." *Town Planning & Engr. Associates, supra* at 746. "Courts do not go out of their way . . . to impose hardship upon the parties beyond that which is necessary to uphold the policy of the law." *Nussenbaum* v. *Chambers & Chambers Inc.*, 322 Mass. 419, 422 (1948). In a case such as this, "we have to ask whether a consequence, beyond [any] prescribed by statute, should

---

[4] Nothing we say here should be taken as intimating our view on the viability of a criminal case against any party.

attach, inhibiting recovery." *Town Planning & Engr. Associates, supra* at 745. "To find a proper answer, all the circumstances are to be considered and evaluated: what was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract (were 'the characteristics which gave the plaintiff's act its value to the defendant . . . the same as those which made it a violation . . . of law'); what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall." *Id.* at 745-746 (footnotes omitted).

We think the following factors are significant to the required analysis in this case. Of primary importance is the fact that neither the oral agreement itself nor its performance is, per se, illegal. If an illegal act took place, it involved intentional understatement of the costs of construction by nondisclosure of the oral agreement, with the intent improperly to influence the mortgage lender or insurer. The law provides a criminal penalty for such activity. However, "[i]n general, illegality in a contract is a defence only because it is against public policy that the court should be called upon to enforce contracts that the parties have been expressly or impliedly forbidden by law to make or to perform." *Nussenbaum* v. *Chambers & Chambers Inc., supra* at 421-422.

No such circumstance exists here because the illegality, if any, was separately identifiable and punishable and tangential to and apart from the agreement itself. Secondly, it would be difficult to avoid the conclusion that Starr was as much a party to the allegedly fraudulent statement as Abrams Construction. She, too, was a signatory to the form in question, which was labeled "Contractor's *and/or Mortgagor's* Cost Breakdown" (emphasis added). The record before the arbitrators amply supports the conclusion that both Starr and the developer to whom she delegated the task

of overseeing construction and financing arrangements were continually advised of the extent of the anticipated overruns as the plans and specifications were developed and altered, and therefore knew at the time the breakdown form was signed that it understated the best current estimate of the actual costs of construction. It should also be noted that the actual application for mortgage insurance (on yet another FHA form) was made not by Abrams Construction but by Starr, apparently working from the form no. 2328 figures. A third factor of some importance is that the $66,856 claim of Abrams Construction appears from the record to represent only actual extra costs of construction. It contains no element of overhead or profit over that which was contained in the "official" contract figure of $1,710,000. Thus, if the arbitration award is enforced, Abrams Construction will realize no real gain; if it is vacated, the result is pure windfall to Starr, the repudiating party.

Finally, there is the question of subversion of FHA policy. It appears that the FHA may insure mortgages, such as that here involved, in a principal amount of not more than ninety percent of the value of the facility. See 12 U.S.C. § 1715w(d)(2) (1976). There was testimony before the arbitrators to the effect that the FHA's determination of the maximum amount of the mortgage is based on the ability of the facility to support the mortgage, looking on that score to projections of the income-generating capacity of the facility. The net effect of the oral arrangement here could only have been to *reduce* the mortgage as a percentage of the true value of the facility, since the agreement in essence called upon Starr to *increase* her own direct investment in the equity. Since there was no agreement to secure the notes, which were to be given in payment by Starr, by an interest in the income of the nursing home or in the home itself, there was no demonstrated impact on the income-producing potential used by the FHA to compute the maximum allowable mortgage. For the same reasons, the security provided by the mortgage itself was not diminished

or endangered. We thus have some difficulty in finding
that the agreement actually undermined FHA mortgage in-
surance policies and practices in any significant respect. We
conclude, although the question is close, that the "vector of
considerations" relevant under the *Town Planning* decision
favors Abrams Construction. See *Town Planning & Engr.
Associates*, 369 Mass. at 746-747.

The cases cited by Starr are inapposite. In *Poskus* v.
*Braemoor Nursing Home, Inc.*, 6 Mass. App. Ct. 896
(1978), the court never reached the question whether a note
entered into to circumvent an FHA fee limitation was unen-
forceable on grounds of illegality or public policy. The case
was decided on contract principles. *Id.* at 897. Unlike the
present case, *Fouquette* v. *Millette*, 310 Mass. 351 (1941),
involved an agreement, the very performance of which in-
volved an illegal act. In *Council* v. *Cohen*, 303 Mass. 348
(1939), it was held that one who has agreed with a govern-
mental agency to accept bonds and cash for a full release of
his claims against property may not insist that the property
owners execute a second mortgage on the property, unau-
thorized by the agency, as a condition to the release. In
*Council*, the property owners' mortgage had been fore-
closed, and their only hope of recovering their home was
through the arrangement insisted upon by the mortgagee.
The facts here are much less onerous. Parties of equal
bargaining strength appear to have come to an accommoda-
tion by which they would circumvent official procedures,
thereby providing themselves with a benefit (of time not lost
to the bureaucratic process) of value to each. As the *Coun-
cil* court indicated, "[t]he court should proceed with ex-
treme caution when called upon to declare a transaction
void on grounds of public policy, and prejudice to the
public interest should clearly appear before any such dec-
laration is made." *Id.* at 352. Under the guidelines of the
*Town Planning & Engr. Associates* decision[5] which are in-

---

[5] Similar factors would be relevant were we to apply the analysis sug-
gested by the Restatement (Second) of Contracts to the questions of the
agreement's enforceability and the availability of a restitution remedy

formed by the careful study advised by *Council,* we conclude that the public interest will not be done a disservice by enforcement of the arbitrators' award. In so doing, we do not condone sharp practices or suggest that unlawful acts will routinely by judicially approved. In an area where decision making necessarily must proceed on a case by case basis, we hold only that facts must be viewed under the considerations governing claims of illegality and the general policy favoring enforcement of arbitral awards. When so viewed, if the result reached by balancing the competing considerations appears tenable on any rational basis, enforcement of the arbitrators' award is justified.

*Judgments affirmed.*

where one party has performed. See Restatement (Second) of Contracts §§ 178 & 197 comment b and illustration 5 (1979).