**In re SANBORN, INC., Debtor.**

**Bankruptcy No. 94–40207.**

United States Bankruptcy Court,
D. Massachusetts.

May 22, 1995.

Douglas R. Gooding, Kevin Newman, Boston, MA, for debtor.

Jack Bryan Little, Boston, MA, for HRT.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

### I. INTRODUCTION

Before the Court for determination is a "Motion to Require Debtor to Surrender Possession of Plaistow, New Hampshire Real Property and to Perform Lease Obligations" (the "Motion") filed by Hampshire Realty Trust ("HRT") against Sanborn, Inc. (the "Debtor" or "Sanborn"). Through its Motion, HRT seeks orders (1) compelling the Debtor to surrender possession of real property located at 7 Kelley Road, Plaistow, New Hampshire (the "Plaistow Property"), and (2) directing the Debtor to pay HRT the sum of $49,800, allegedly representing four months of post-petition rent. After a preliminary hearing on the Motion, the Court ordered the Debtor to abandon its interest, if any, in the real estate, and continued Hampshire's claim for rent or use and occupancy for an evidentiary hearing. After the evidentiary hearing, the Court took the matter under advisement. The following constitutes findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052.

### II. FACTS

On or about January 2, 1992, the Debtor entered into an agreement (the "January Agreement")[1] with Mark O. Henry ("Henry"), Beede, Inc. and Cash Energy, Inc. to purchase the assets of various entities controlled by Henry, including Reclamation Services, Inc., Beede Waste Oil Corporation, Cash Energy, Inc., Cash Oil Sales, Inc., Industrial Fuels, Inc., Northern Oil Inc., CFI, Inc. and Cash Burner Sales, Inc.

The January Agreement also provided that HRT, a real estate trust controlled by Henry[2], would lease the Plaistow Property to Sanborn and/or its nominee for a period of 10 years. And it provided for an employment contract between Sanborn and Henry. Paragraph five (5) of the Agreement provided that "Henry [would] receive an employment contract with Sanborn and/or its nominee similar to the standard executive employment agreement utilized by Sanborn[.]"

As contemplated by the January Agreement, HRT, as lessor, and "Sanborn Environmental Corporation", as lessee, entered into a lease agreement (the "Plaistow Lease")[3] for the Plaistow Property for the period of January 2, 1992 to December 31, 2001. The Plaistow Lease provided for payments of "basic rent" in the amount of $2,500 per month together with property taxes, insurance, repairs and maintenance. Section 4.01 of the Plaistow Lease provided that "no assignment, mortgaging or subletting, if consented to by Landlord, [would] relieve Tenant of its liability under the Lease."

Between the period of January, 1992 to July, 1992, Sanborn did not make any payments under the Plaistow Lease to HRT. Furthermore, Sanborn did not comply with the terms of the employment contract with Henry.

On July 30, 1992, the Commonwealth of Massachusetts Superior Court, Department of the Trial Court, Suffolk Division, issued a preliminary injunction (the "Injunction Order") in connection with an action[4] com-

---

1. The January Agreement was also the subject of an adversary proceeding (*Sanborn, Inc. v. Internal Revenue Service, et al.*, Adv. No. 94–4236) regarding the ownership of certain vehicles.

2. Henry is the sole trustee of HRT. Oddly, Henry testified that he does not know the identity of the beneficiaries of HRT, a nominee trust.

3. The Plaistow Lease provided that "Sanborn Environmental Corp." was the "Tenant" under the Lease. At the time that the Plaistow Lease was executed, there was no corporation by the name of Sanborn Environmental Corporation; Sanborn Environmental Corporation was a d/b/a for Sanborn, Inc.

4. *Northeast Petroleum Division of Cargill, Inc. v. Cash Energy, Inc., et al.*, No. 92–4560, Commonwealth of Massachusetts, Superior Court, Suffolk Division.

menced by Northeast Petroleum Division of Cargill, Inc. ("Northeast") against both Henry as a defendant and the Debtor as a reach-and-apply defendant. The Injunction Order enjoined (1) Henry (and the other named defendants but not including HRT) from transferring or otherwise disposing of any of Henry's assets and (2) Sanborn from paying any sums to or for the benefit of Henry, Kathleen Henry or Cash Energy, Inc.

On October 7, 1992, Henry, *as Trustee of HRT* and the Debtor entered into an agreement (the "October Agreement") [5] pursuant to which the parties intended to modify their obligations under the January Agreement. The Debtor promised to pay to HRT the sum of $202,000, consisting of (a) $25,000 as "payment for loans made by Henry & Company to Reclamation Services and Sanborn", and (b) $177,000 "pursuant to the Lease Modification provision". The Lease Modification provided the following:

> In consideration of the payment of $177,000 ... the lease between [HRT] and Sanborn shall be modified pursuant to the following terms: HRT shall lease for no additional consideration to Sanborn or its nominee the property located at 7 Kelley Road, Plaistow, NH for a period of seven (7) months from the date hereof. Sanborn may cancel said lease upon thirty (30) days written notice to [HRT], but in any case, will not be entitled to any prorata refund of the $177,000 payment. Should Sanborn or its nominee hold over and continue to occupy the premises past the initial seven (7) month lease, [HRT] will be entitled to monthly payments of $5,000 for each month that the property continue [sic] to be so occupied.

The October Agreement also included a provision entitled "Mutual Release" which stated:

> Except as otherwise provided for herein, Henry, RSI, and Sanborn each hereby remise, release and forever discharge the other and all of their affiliate and subsidiary companies and ... assigns.... from any and all claims, debts, demands, action, causes of action, suits, accounts, covenants, contracts, agreements and liabilities ... which against each other said Sanborn, RSI, and Henry may now have or ever had ... *and particularly concerning the Henry Employment Contract and any and all matters in any way related to the business relationships between and among Sanborn, RSI, and Henry.*

(emphasis supplied).

At the time of the negotiation of the October Agreement, approximately $1,100,000 was owed by Sanborn to Henry and or entities controlled by Henry under the January Agreement, including (1) taxes, (2) salary, health insurance and life insurance pursuant to the employment contract with Henry, personally, (3) rent owed under leases with Kram Realty Trust ("KRT"), HRT and Sun Realty Trust ("SRT"), all entities controlled by Henry and (4) monies owed to Northeast for unpaid fuel purchases.

Henry testified that, in consideration of $177,000 to be paid to HRT under the October Agreement, he agreed to: (1) terminate a ten-year lease between Sanborn and Sun Realty Trust (monthly rental obligation of $2500 plus property taxes); (2) terminate a one-year lease between Sanborn and Kram Realty Trust (monthly rental obligation of $7,000 plus property taxes); (3) terminate his personal three year employment contract with Sanborn (annual salary of $100,000); and (4) modify the ten-year lease between Sanborn and HRT (lease to expire in April, 1993). Henry also stated that the $25,000 payment was intended as repayment of a loan made by Henry & Company [6] to Sanborn to cover Sanborn's payroll.

The corresponding testimony of Scalise (on behalf of HRT) suggested that the purpose

---

**5.** Henry, Dominick J. Scalise ("Scalise"), on behalf of Henry, and Paul X. Tobin ("Tobin") and Craig Williams ("Williams"), both on behalf of Sanborn, directly negotiated the October Agreement. The agreement was signed by George W. Sanborn (as President of Sanborn) and Henry (individually, and as representative of all entities owned, operated and/or controlled by Henry; also as representative of Reclamation Services, Inc.).

**6.** Henry & Company was also a defendant in the Superior Court action and was, therefore, also obligated to comply with the Injunction Order.

of the October Agreement was to terminate various obligations that flowed between Sanborn and Henry. Moreover, Tobin (on behalf of Sanborn) testified not only that the $177,000 was intended to be a lump sum settlement of the various obligations (including obligations under the Plaistow Lease) owed by Sanborn to Henry, but also that the purpose of making the payment to HRT was so that Sanborn complied with the Injunction Order.

In accordance with the terms of the October Agreement, Sanborn made both of the referenced payments of $177,000 and $25,000 by checks dated October 6, 1992. Except for the foregoing payments, no other payment (from *any* entity) of rent on the Plaistow Property was made to HRT. However, Tri–State, Sanborn's wholly owned subsidiary, continued to occupy the Plaistow Property beyond the contemplated seven months from the execution of the October Agreement and until August, 1994.

Although Sanborn executed the October Agreement, it never actually occupied the Plaistow Property. The tenant, Tri–State, was engaged in the retail oil business. Tri–State had been incorporated in August 1992. George Sanborn testified that Sanborn transferred the assets of the retail oil business it had acquired from Henry to Tri–State in the summer of 1992 and prior to the execution of the October Agreement.[7]

Tri–State maintained its own insurance coverage, bank accounts, financial records and paid for all operating expenses in connection with the business. Tri–State also maintained its own employer identification number. However, the tax filings were handled by the controller's office of Sanborn, in Wrentham, Massachusetts.

Sanborn filed the instant petition under Chapter 11 of the Bankruptcy Code on January, 21, 1994. Shortly thereafter, it entered into a "Stipulation for Secured Borrowings, Use of Cash Collateral and Adequate Protection" (the "Cash Stipulation")[8] with First National Bank of Boston (the "Bank"). The Cash Stipulation provided that the Bank be granted, as additional collateral, security interests in all of Tri–State's accounts, inventory and general intangibles and proceeds thereof. It also provided that "Tri–State [would] make available to the Debtors for use by the Debtors to pay ordinary and necessary business expenses, the proceeds from the collection of its accounts or sale of its assets in excess of proceeds needed to pay the ordinary and necessary business expenses of Tri–State[.]"

## III. *LEGAL POSITIONS OF THE PARTIES*

Each of the parties raises several alternative arguments.

### A. HRT

HRT argues that the lease modification provision of the October Agreement modified rather than terminated the Plaistow Lease. HRT asserts that, by operation of law, the Plaistow Lease, because not terminated as of the date of the filing of the petition, was deemed rejected sixty (60) days thereafter.[9] *See* 11 U.S.C. § 365(d)(4). HRT then argues that it is entitled to an administrative rent claim for both the pre-rejection period (January 21, 1994—March 22, 1994) and the post-rejection period (March 22, 1994—August 21, 1994).

With respect to the pre-rejection period, HRT asserts that 11 U.S.C. § 365(d)(3) requires that the debtor-in-possession timely perform all obligations owed on an unexpired lease until such lease is assumed or rejected. HRT argues that the October Agreement modified only the base rent owed under the Plaistow Lease; all other provisions of the

---

7. Tobin testified that the decision to transfer the said assets to Tri–State was grounded on Sanborn's fear that the Plaistow Property might be environmentally contaminated.

8. A copy of the Cash Stipulation was submitted as Plaintiff's Exhibit "6". Notwithstanding the fact that the Cash Stipulation submitted by the Plaintiff was unsigned, the Court finds that the

copy submitted was a true copy of the Cash Stipulation that was approved by the Court on February 11, 1994.

9. The Debtor never filed a motion to assume or reject the Plaistow Lease. Nor did the Debtor make any request for an extension of the time to assume or reject the Plaistow Lease.

lease remained in effect. Therefore, according to HRT, Sanborn was obligated to pay on a monthly basis to HRT: (1) $5,000.00 for rent, (2) $3,300 for property taxes (3) $75.00 for late fee, and (4) interest (18%).

With respect to the alleged post-rejection period, HRT argues that, notwithstanding the Code's silence on the Debtor's payment obligations during a post-rejection period, HRT's burden under 11 U.S.C. § 503(b)(1)(A) is met by the presumption adopted in *In re Energy Resources Co., Inc.,* 47 B.R. 337 (Bankr.D.Mass.1985) that the reasonable value for the use of the premises is the lease contract rate, absent evidence that the contract rate is unreasonable.

HRT also argues that Sanborn, and not Tri–State, is liable to HRT for the use and occupancy of the Plaistow Property during the alleged pre and post-rejection periods, despite the fact that Tri–State alone occupied the Plaistow Property during this post-petition time period. HRT claims that Tri–State had become inextricably tied to the Debtor's estate. First, Sanborn executed the October Agreement while Tri–State was in possession of the property. Second, Tri–State, a wholly-owned subsidiary of the Debtor, operated an oil delivery business on the Plaistow Property using vehicles purportedly owned by the Debtor. Third, pursuant to the Cash Stipulation entered into during the pendency of the Chapter 11 case, Tri–State granted to the Bank a security interest and lien on its accounts, inventory and general intangibles and all proceeds thereof for the benefit of the Debtor and, also, was obligated to make available Tri–State proceeds for use by the Debtor to pay ordinary and necessary business expenses.

Finally, HRT argues that if the October Agreement is deemed improper on account of the Injunction Order, the clean hands doctrine should not bar its recovery for postpetition rent. HRT argues that it was not a party in the Superior Court litigation which gave rise to the Injunction Order and that neither Henry nor his wife, Kathleen Henry, hold a beneficial interest in HRT. Therefore, the Debtor's payment of $177,000 to HRT was not in violation of the Injunction Order.

Alternatively, if the October Agreement is found to be in violation of the Injunction Order, HRT argues that the clean hands doctrine would still not bar its recovery from Sanborn because (1) HRT did not engage in unconscionable conduct that was directed *at Sanborn,* and (2) HRT did not engage in unconscionable conduct that materially affects the instant controversy—that is, HRT's claim against Sanborn for use and occupancy of the Plaistow Property. HRT also argues that if the $177,000 payment was made in violation of the Injunction Order, the violation was clearly committed by the Debtor, and not HRT, since HRT was not a party to the Superior Court litigation. The denial of its claim, HRT insists, would result in an unjust enrichment to the Debtor.

## B. Debtor

The Debtor argues that it is not obligated to pay rent under § 365(d)(3) because any lease it had with HRT expired pre-petition. In support of its position, the Debtor reminds the Court that the October Agreement (1) modified the expiration date of the Plaistow Lease from December 31, 2001 to "a period of seven months"—May 6, 1993; and (2) included "holdover" language which was entirely consistent with the termination of the lease.

Assuming that the lease expired pre-petition, the Debtor argues that HRT must base its claim under § 503(b)(1)(A) of the Bankruptcy Code. The Debtor asserts that HRT would not be entitled to an administrative claim under § 503(b)(1)(A) because HRT has failed to prove that the usage of the Plaistow Property conferred an *actual* benefit on the Debtor's estate. The Debtor points out that HRT has not shown that the Debtor actually utilized the Plaistow Property. The Plaistow Property was used exclusively by Tri–State.

The Debtor further asserts that even if the lease did not expire pre-petition, HRT would not automatically be entitled to administrative rent for the pre-rejection period under § 365(d)(3). The Debtor argues that HRT is still required to establish its claim for administrative status under § 503(b)(1)(A). The Debtor asserts that HRT has not met the

standards for establishing an administrative claim under § 503(b)(1)(A). And, even if the Court determines that the Debtor is obligated to HRT under § 365(d)(3), the Debtor asserts that the monthly rental obligation was only $2,500—that is the rent reserved under the Plaistow Lease.

The Debtor continues to argue that, even if the Debtor was obligated to HRT during the pre-rejection period under § 365(d)(3), HRT has still not established an administrative claim for the post-rejection period. The Debtor acknowledges that the contract rate is presumed to be the reasonable value for the use and occupancy of the premises unless an opposing party produces evidence that the lease rate is unreasonable. The Debtor asserts, however, that the Debtor met its burden of proving that the lease rate is unreasonable by showing that the Debtor did not occupy the Plaistow Property during the post-petition period. HRT, the Debtor argues, failed to show that the usage of the Plaistow Property benefitted the Debtor's estate. The Debtor points out that Tri–State and the Debtor are distinct legal entities and, therefore, the Debtor should not be liable for Tri–State's obligations. The Debtor suggests that HRT failed to introduce any evidence which would establish a basis for piercing the corporate veil (e.g., misrepresentation).

The Debtor next argues that the October Agreement should not be enforced because it was fraudulently made to evade the Injunction Order. Furthermore, the Debtor argues that the "unclean hands" of a prepetition debtor are not imputed to the debtor-in-possession or trustee so that fraud may be asserted as a defense for the benefit of general unsecured creditors.

If the Court determines that the October Agreement is not voidable, the Debtor argues that HRT should not be entitled to any administrative rent because the $177,000 represented a prepayment of *future* rent. The Debtor asserts that § 365(d)(3) and (4) would not apply since the Debtor had no material future obligations to perform under the executory contract. Therefore, to the extent that the Debtor is obligated to pay any administrative rent, the Debtor suggests that the

doctrine of "recoupment" would enable the Debtor to offset any postpetition administrative rent obligation from its prepetition payment of $177,000. Finally, to the extent that the Court determines that HRT has an allowed claim for post-petition administrative rent, the Debtor indicates that such claim must be equitably subordinated under 11 U.S.C. § 510(c).

## IV. DISCUSSION

### A. HRT's Administrative Claim

The Debtor argues that any lease it had with HRT expired pre-petition. In support of its argument, the Debtor states that the October Agreement modified the expiration date of the Plaistow Lease from December 31, 2001 to May 6, 1993 and also included "holdover" language consistent with the termination of a lease. This Court agrees. While the lease modification provision provides that "the Lease between [HRT] and Sanborn shall be modified pursuant to the following terms[.]", it also provides "[s]hould Sanborn or its nominee *hold over* and continue to occupy the premises past the initial seven (7) month lease, [HRT] will be entitled to monthly payments of $5,000 for each month that the property continue [sic] to be occupied." (emphasis supplied). The lease modification provision terminated Sanborn's obligations to HRT under the Plaistow Lease. While Sanborn was not obligated to make any additional rental payments to HRT after the execution of the October Agreement and prior to the expiration of the seven (7) month period, it was also not obligated to *lease* the premises for any period of time thereafter. After the seven (7) month period, the status of Sanborn or its nominee was only that of a "hold over" tenant. The term "hold over" generally refers to the occupancy of a leased premises after the expiration of a lease. *See Boudreau v. Johnson,* 241 Mass. 12, 16, 134 N.E. 359, 361 (1922) ("[a] tenant, in holding over after the expiration of a written lease, holds the premises as a tenant at will, according to the terms of the written, in the absence of a new agreement.") Accordingly, the Court finds that the Plaistow Lease, as modified by the October Agree-

ment, expired by its own terms prior to the commencement of the case.

▮ Since there was no lease to assume or reject, HRT's claim against Sanborn is properly characterized as an administrative expense claim under § 503(b)(1)(A).[10] Pursuant to § 503(b)(1)(A), the moving party must establish that the expense was "reasonable, necessary and benefitted the estate." *In re Butcher,* 108 B.R. 634 (Bankr. E.D.Tenn.1989); *See La Electronica, Inc. v. Capo–Roman (In re La Electronica, Inc.),* 995 F.2d 320 (1st Cir.1993) (services must confer an "economic benefit" to the estate). The burden of persuasion rests with the claimant seeking the administrative expense. *Id.* at 322.

▮ In the instant case, HRT failed to meet its burden of persuasion under § 503(b)(1)(A) to show that the expense was reasonable, necessary and benefitted the estate. First, Tri–State, and not the Debtor, occupied the premises following the date of the bankruptcy filing. This fact was not controverted by HRT.[11] Second, despite HRT's assertion that the Cash Stipulation provided that (1) Tri–State's assets would serve as adequate protection to the Bank for the benefit of the Debtor, and (2) Tri–State's net accounts receivable were to be available to the Debtor, HRT failed to introduce evidence that the Bank resorted to the Tri–State collateral or that any Tri–State funds were ever paid over to the Debtor. HRT failed to demonstrate that Tri–State's occupancy of the Plaistow Property ever benefitted the Debtor. Accordingly, HRT failed to establish an administrative claim for rent during the post-petition period pursuant to § 503(b)(1)(A).

## B. The Enforceability of the October Agreement

Even if HRT had been able to demonstrate that the October Agreement had not expired pre-petition [12], this Court would not have allowed HRT a claim under § 365(d)(3), because of the unenforceability of the October Agreement. The Court would not have enforced that agreement because it finds the October Agreement was an illegal contract and HRT seeks relief with unclean hands.

▮ The evidence presented at the hearing established that the $177,000 payment was made by the Debtor to resolve all outstanding disputes between the Debtor and Henry. Some of those disputes related to sums owed to Henry personally and, therefore, some of those funds were on account of those obligations to Henry. All parties were aware of the Injunction Order; Tobin even testified that the October Agreement was drafted to provide that all funds be paid to HRT to "ensure" that Sanborn complied with the Injunction Order.[13] The Court finds that the October Agreement was purposefully structured to evade the Injunction Order by funnelling payments to Henry through HRT.

10. Section 503(b)(1)(A) provides:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]

11 U.S.C. § 503(b)(1)(A).

11. HRT contends that because the Debtor allegedly owned vehicles which remained on the property while Tri–State occupied the property, the Debtor derived a benefit for § 503 purposes. There was no evidence presented at trial that Sanborn owned vehicles that were on the property during the post-petition period. However, even if Sanborn did own vehicles which remained on the Plaistow Property during the post-petition period, HRT failed to demonstrate that the storage of or Tri–State's usage of the vehicles benefitted the Debtor's estate.

12. Arguably, a creditor holding a valid claim under § 365(d)(3) may not have to demonstrate benefit to the estate. In the case of *All for A Dollar, Inc.,* 174 B.R. 358 (Bankr.D.Mass.1994), this Court stated that:

> the enactment of § 365(d)(3) commanded the trustee's strict adherence to the terms of any lease of nonresidential real property, and, therefore removed the bankruptcy court's discretion to alter the amount of the stated rent under the lease. Section 365(d)(3) explicitly requires a debtor to *timely* perform all post-petition obligations due under an unexpired lease.

*Id.* at 360 (citations omitted).

13. This drafting goal failed.

HRT asserts that the Debtor's payment of $177,000 under the October Agreement was not in violation of the Injunction Order because HRT was not a party to the Superior Court litigation. The Court appreciates this distinction for a different reason. The fact that HRT was not a "party" to the Superior Court litigation is the very reason why it was designated to receive the lump sum payment under the October Agreement.

 The validity and enforceability of a contract is governed by state law. Since this case is pending in Massachusetts, the Court should apply Massachusetts choice of law principles. Notwithstanding the fact that the Plaistow Property is located in New Hampshire, the January Agreement provided that "[t]his Agreement and the terms hereof shall be governed and controlled by the laws of the Commonwealth of Massachusetts." The Lease Modification provision of the October Agreement did not modify the forum selection provision. Massachusetts law has recognized the law reasonably chosen by the parties to govern their rights under contract. *Morris v. Watsco, Inc.*, 385 Mass. 672, 674, 433 N.E.2d 886, 888 (1982). *See Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 574–75, 646 N.E.2d 741, 743 (1995) (forum selection clauses are valid and enforceable except when it is known that enforcement would be unreasonable). Massachusetts was not an unreasonable forum selection given the fact that (1) Sanborn was located in Wrentham, Massachusetts, and (2) HRT's address on the Plaistow Lease was listed in North Andover, Massachusetts. Accordingly, this Court finds that Massachusetts law governs the enforceability of the October Agreement.

 Massachusetts courts[14] will not aid in the enforcement of an illegal contract. *Tocci v. Lembo, et al.*, 325 Mass. 707, 709, 92 N.E.2d 254, 255 (1950); *Nussenbaum v. Chambers & Chambers, Inc.*, 322 Mass. 419, 421, 77 N.E.2d 780, 782 (1948); *Reuter v. Ballard*, 267 Mass. 557, 166 N.E. 822 (1929). *See also Health Care Collection Services, Inc. v. Protocare, Inc.*, No. 92–12634, 1995 WL 96911 *2 (D.Mass. Feb. 24, 1995) ("Massachusetts court will not enforce a contract when an illegality constitutes an essential element of the contract."). "The illegality of an agreement may be in the consideration, in a promise or in its performance. . . . A concise statement of the rule is that agreements are illegal if they are contrary to law, morality, or public policy." 17A Am.Jur.2d, *CONTRACTS* at § 242.

 This Court will not enforce a contract that the parties have been expressly or impliedly forbidden by law to make or perform. *Nussenbaum*, 322 Mass. at 421, 77 N.E.2d at 782. The October Agreement is such an agreement as it was fashioned by *both* parties to violate the Injunction Order. Regardless of the fact that HRT and Sanborn might have equally bargained for the October Agreement, this Court, on public policy grounds, will not act as an accessory after the fact. The Court will not enforce an agreement that was purposefully drafted to violate a state court order.

██ HRT's contention that Sanborn was not harmed by the October Agreement is unavailing. Northeast Petroleum, the party which obtained the injunction against Henry in Superior Court, was certainly "harmed" by the October Agreement and the integrity of the Suffolk Superior Court was an intended victim as well. Public policy does not favor the enforcement of an illegal contract. "[A] contract will generally be held void where the object of the parties is to perpetrate a fraud upon a third person or upon the public." 17A Am.Jur.2d, *CONTRACTS* at § 292.

 Furthermore, HRT comes to this court with unclean hands.[15] HRT asserts

---

14. Even if New Hampshire were the proper forum, the result would likely be no different. *See Brooks v. R.A. Clark's Garage, Inc.*, 117 N.H. 770, 771, 378 A.2d 1144, 1145 (1977); *William Coltin & Co., Inc. v. Manchester Savings Bank*, 105 N.H. 254, 256, 197 A.2d 208, 210 (1964) (contract for broker's commission was unenforceable where broker did not have a license in violation of statute).

15. Sanborn argues that the "unclean hands" of a pre-petition debtor are not imputed to a debtor-in-possession or trustee. This Court agrees. *See e.g., McGraw v. Liberty Airlines, Inc. (In re Bell & Beckwith)*, 89 B.R. 632, 640 (Bankr.D.Ohio 1988) ("The trustee is not necessarily subject to all defenses which could be asserted if the [d]ebtor itself brought action on its own behalf."); *Has-*

that the clean hands doctrine should not bar its recovery from the Defendant because HRT did not engage in unconscionable conduct that was either directed at Sanborn or materially affected the instant controversy. HRT argues that "[c]ourts do not go out of their way to discover some illegal element in a contract or to impose hardship upon the parties beyond which is necessary to uphold the policy of the law." *Nussenbaum*, 322 Mass. at 421, 77 N.E.2d at 782; *see Starr v. J. Abrams Construction Co., Inc.*, 16 Mass. App.Ct. 74, 448 N.E.2d 1311 (1983) (the defense of illegality is not available if the illegality is separately identifiable and tangential to and apart from the contract itself).

In support of its argument, HRT relies on the case of *Norton Company v. Carborundum Co.*, 530 F.2d 435 (1st Cir.1976). In that case, the First Circuit declined to reverse a district court ruling that use of the unclean hands doctrine requires that the inappropriate behavior be directly related to the subject matter of the litigation. The Court said:

> [w]hat might be disabling misconduct or even fraud from the perspective of a broad reading is of less moment when viewed from the perspective of a less encompassing reading. . . . We do not find that, given its broad equitable discretion, the court failed properly to apply to this situation the equitable maxim that 'he who comes into equity must come with clean hands.' . . . '[w]hile equity does not demand that its suitors shall have led blameless lives, . . . as to other matters, it does not require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.'

530 F.2d at 441–42 (citations omitted).

HRT argues that it has established its claim without reference to fraud in the October Agreement. Specifically, HRT asserts that the motivation of the parties in entering into the October Agreement is immaterial to HRT's claims against Sanborn for use and occupancy of the Plaistow Property.

The Court finds little merit in HRT's argument. HRT's claim against Sanborn—the controversy at issue—is certainly related to the October Agreement. In fact, its claim against Sanborn arises out of the October Agreement—that is, the Lease Modification provision. Furthermore, the Lease Modification provision (which provides for the payment of the $177,000 to HRT) is the vehicle pursuant to which Sanborn transferred money to Henry in violation of the Injunction Order. It is difficult to conceive how HRT's claim against Sanborn, arising from an agreement drafted to evade a court order, does not arise from an act of illegality. Not only does HRT's claim reference the October Agreement, its validity relies on the enforceability of the illegal agreement. While the doctrine of clean hands is not one of absolutes, it should be applied so as to accomplish its purpose of promoting public policy and the integrity of the courts. *Walsh v. Atlantic Research Associates, Inc.*, 321 Mass. 57, 65, 71 N.E.2d 580, 585 (1947). The Supreme Court in *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) expounded on the clean hands doctrine:

> [I]t is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. . . . This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. . . . Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions.

*Id.* at 814–15, 65 S.Ct. at 997. The issue before the Court is not only the interests of private party litigants, but also the public's interest in preserving the integrity of state

sett v. McColley (In re O.P.M. Leasing Services, Inc.), 28 B.R. 740, 761 (Bankr.S.D.N.Y.1983) (trustee's right to recover payments made by debtor not barred by debtor' prepetition wrongful conduct).

court orders. This Court, therefore, finds that the clean hands doctrine would be appropriately applied to bar HRT's recovery against Sanborn.

## V. CONCLUSION

In view of the foregoing, the Court finds and rules that HRT has not sustained its burden of proof that (i) the Plaistow Lease, as modified by the October Agreement was in effect as of the commencement of the case or (ii) its expense claim benefitted the Debtor's estate pursuant to § 503(b)(1)(A). Furthermore, to the extent that the October Agreement had not expired pre-petition, the Court finds and rules that the October Agreement was made in violation of the Injunction Order, and, is therefore unenforceable. Accordingly, HRT's administrative claim against Sanborn for use and occupancy of the Plaistow Property during the post-petition period is denied.

### ORDER

In accordance with the separate Memorandum of Decision issued on May 22, 1995, the Court hereby denies the "Motion to Require Debtor to Surrender Possession of Plaistow, New Hampshire Real Property and to Perform Lease Obligations" (the "Motion") filed by Hampshire Realty Trust ("HRT") against Sanborn, Inc. (the "Debtor" or "Sanborn"), to the extent that HRT is seeking an administrative claim against Sanborn for use and occupancy during the post-petition period.