**In re SANBORN, INC., Debtor.**

**Bankruptcy No. 94–40207–HJB.**

United States Bankruptcy Court,
D. Massachusetts.

Feb. 9, 1998.

See also, 181 B.R. 683.

Douglas R. Gooding, Choate, Hall & Stewart, Boston, MA, for Stephen S. Gray, Disbursing Agent for Chapter 11 Estate of Sanborn, Inc.

Jack Bryan Little, Boston, MA, for Henry, HRT, and CEI.

Tali A. Tomsic, Chapter 7 Trustee, North Andover, MA, for Estate of Mark O. and Kathleen Henry.

### *MEMORANDUM OF DECISION*

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination is an "Objection and Counterclaim to Proofs of Claim of Mark O. Henry and Related Entities"[1] (the "Objection") filed by Sanborn, Inc. ("Sanborn" or the "Debtor"). The Debtor argues that four proofs of claim (the "Henry Claims") filed by Mark O. Henry ("Henry") in his individual capacity, in his capacity as Treasurer of Cash Energy, Inc. ("CEI"), and in his capacity as Trustee of Hampshire Realty Trust ("HRT") should be disallowed in their entirety.[2]

---

1. The counterclaim filed by Sanborn asserts a claim for relief against Henry for *damages* caused by certain allegedly fraudulent actions by Henry. Where "an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding." Fed. R. Bankr.P. 3007; *see also Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1140 n. 4 (1st Cir.1992) (where chapter 7 trustee filed objection to claims and included a counterclaim for breach of contract, which was a claim "to recover money or property" under Fed.R.Bankr.P. 7001(1), adversary proceeding was properly initiated). However, because the Debtor's objections to the Henry Claims is sustained here, and the Debtor offered to withdraw its counterclaim in that eventuality, the Court will continue to treat this dispute as a contested matter.

2. The Court notes that Henry and his wife filed a Chapter 7 bankruptcy petition on November 13,

## I. *Factual Background*

In a May 22, 1995 decision (the "1995 decision") disposing of a "Motion to Require Debtor to Surrender Possession of Plaistow, New Hampshire Real Property and to Perform Lease Obligations" (the "Plaistow Motion") filed by HRT, this Court set out a full recitation of the pre-petition facts involved in this contested matter. *See In re Sanborn, Inc.,* 181 B.R. 683 (Bankr.D.Mass.1995). Therefore, the Court will only highlight the facts essential to the resolution of this dispute, quoting and paraphrasing liberally from the 1995 decision.

In a January 1992 agreement (the "January Agreement"), the Debtor agreed to purchase the assets of various entities controlled by Henry. The agreement also provided that (1) HRT, a real estate trust controlled by Henry, would lease property it owned in Plaistow, New Hampshire (the "Plaistow Property") to Sanborn for ten years; and (2) " 'Henry [would] receive an employment contract with Sanborn and/or its nominee similar to the standard executive employment agreement utilized by Sanborn[.]' " *Sanborn,* 181 B.R. at 685.

The subject assets were subsequently conveyed to an affiliate of Sanborn, and the parties entered into the contemplated lease of the Plaistow Property and an employment contract. The lease contained specific provisions regarding rental payments over a ten-year term. However, Sanborn apparently never made any payments under the lease or the employment contract. *Id.*

In July 1992, an unrelated third party persuaded the Suffolk County Superior Court of the Commonwealth of Massachusetts to issue an injunction (the "Injunction Order") against Henry (and the other named defendants *but not including HRT* ) and Sanborn, in connection with an action the unrelated third party had filed against both Henry as a defendant and the Debtor as a

reach-and-apply defendant. "The Injunction Order enjoined (1) Henry (and the other named defendants *but not including HRT* ) from transferring or otherwise disposing of any of Henry's assets and (2) Sanborn from paying any sums to or for the benefit of Henry, Kathleen Henry, or Cash Energy, Inc." *Id.* at 686.

In October 1992, Henry, acting as Trustee of HRT, and the Debtor entered into a new agreement (the "October Agreement"). The purpose of the October Agreement was to "modify [the] obligations under the January Agreement. The Debtor promised to pay to HRT the sum of $202,000, consisting of (a) $25,000 as 'payment for loans made by Henry & Company to Reclamation Services and Sanborn', and (b) $177,000 'pursuant to the Lease Modification provision'." *Id.* That provision stated:

> In consideration of the payment of $177,-000 ... the lease between [HRT] and Sanborn shall be modified pursuant to the following terms: HRT shall lease for no additional consideration to Sanborn or its nominee the property located at 7 Kelley Road, Plaistow, NH for a period of seven (7) months from the date hereof. Sanborn may cancel said lease upon thirty (30) days written notice to [HRT], but in any case, will not be entitled to any prorata refund of the $177,000 payment. Should Sanborn or its nominee hold over and continue to occupy the premises past the initial seven (7) month lease, [HRT] will be entitled to monthly payments of $5,000 for each month that the property continue [sic] to be so occupied.

*Id.* (quoting the October Agreement). Another section of the October Agreement, entitled "Mutual Release," provided:

> Except as otherwise provided for herein, Henry, RSI, and Sanborn each hereby remise, release and forever discharge the

1997, currently pending before Judge Queenan. On January 21, 1998 Stephen S. Gray, the Disbursing Agent for the estate of Sanborn, filed in that case a "Motion ... for Order Approving Stipulation Granting Disbursing Agent Limited Relief from Automatic Stay" and the subject Stipulation with the Chapter 7 trustee of the Henry's estate. The Stipulation provided that

the automatic stay "be lifted on a limited basis to permit the Bankruptcy Court in the Sanborn case to render a decision on the Objection and the Response and to permit the Trustee and/or the Disbursing Agent to prosecute any appeals therefrom." The Stipulation was approved by Judge Queenan on February 6, 1998.

other and all of their affiliate and subsidiary companies and ... assigns ... from any and all claims, debts, demands, action, causes of action, suits, accounts, covenants, contracts, agreements and liabilities ... which against each other said Sanborn, RSI, and Henry may now have or ever had ... *and particularly concerning the Henry Employment Contract and any and all matters in any way related to the business relationships between and among Sanborn, RSI, and Henry.*

*Id.* (quoting the October Agreement) (emphasis added in the 1995 decision).

The Debtor filed its Chapter 11 petition on January 24, 1994. On May 27, 1994, the Henry Claims were filed in this case. The four claims are as follows: (1) a general unsecured claim for $1,127,200 "allegedly arising from [the January] Agreement" filed by Henry individually; (2) a general unsecured claim filed by Henry on behalf of CEI for $102,721, supported by a December 30, 1991 "general letter of understanding" (the "1991 Letter") between Sanborn and Henry (in his capacity as president of "RSI") [3]; (3) a general unsecured claim filed by Henry as Trustee of HRT for $154,000 in connection with the lease of the Plaistow Property; and (4) a priority claim filed by Henry on behalf of HRT for $49,800, representing the post-petition rental obligations imposed by the Plaistow Property lease.

On July 25, 1994, HRT filed the Plaistow Motion, seeking possession of the Plaistow Property and rental payments due under the lease, as modified by the October Agreement. At the evidentiary hearing on the Motion, various parties testified as to the purpose of the October Agreement. Henry testified that, in consideration of $177,000 to be paid to HRT, he agreed to, inter alia, terminate his personal three-year employment contract with Sanborn and modify the ten-year lease

between Sanborn and HRT. *Id.* The testimony of the attorney who represented Henry in negotiating the October Agreement "suggested that the purpose of the October Agreement was to terminate various obligations that flowed between Sanborn and Henry." *Id.* at 686–87. Finally, a high-ranking employee of the Debtor who was involved in those negotiations "testified not only that the $177,000 was intended to be a lump sum settlement of the various obligations (including obligations under the Plaistow Lease) owed by Sanborn to Henry, but also that the purpose of making the payment to HRT was so that Sanborn complied with the Injunction Order." *Id.* at 687. It was also established at the evidentiary hearing that Sanborn executed and distributed checks in the amounts of $177,000 and $25,000 payable to HRT, as contemplated by the October Agreement. *Id.*

In its 1995 decision, the Plaistow Motion was denied, and this Court ruled that (1) the validity and enforceability of the October Agreement was governed by Massachusetts law, and "Massachusetts courts will not aid in the enforcement of an illegal contract," *Id.* at 691 (footnote omitted) (citing cases); (2) the October Agreement was an illegal contract because it "was purposefully structured to evade the Injunction Order by funnelling payments to Henry through HRT," *Id.* at 690; and (3) HRT came to the Court with unclean hands, which also barred enforcement of the October Agreement in its favor. *Id.* at 692. Neither HRT nor Sanborn moved for reconsideration of any of these holdings, or appealed the 1995 decision.

The Court conducted a non-evidentiary hearing on the instant Objection,[4] and took this matter under advisement.

## II. *Positions of the Parties*

Sanborn's primary argument is that the Court should disallow all the Henry Claims

---

**3.** The 1991 Letter outlines "general terms and conditions" which were to be finalized by January 1, 1992. The first-listed term was as follows: "First and foremost, Cash Energy, Beede Oil, CSI, all companies currently owned by Mark Henry, as discussed, will be rolled into one entity, referred to as RSI." The next term was that Sanborn or its assigned subsidiary would purchase "certain assets and liabilities of RSI." Accordingly, the Court finds that the CEI claim is

derivative of the January Agreement between Henry and the Debtor.

**4.** The Debtor stated that it intended to object to all proofs of claim filed by Henry or any entities under his ownership or control, and reserved the right to object to any other such claims not addressed in the Objection. Objection at 2 n.1.

under § 502(d).[5] The Debtor points to the $202,000 it paid to HRT in accordance with the now unenforceable October 1992 Agreement, and argues that unless that money is returned, all claims filed by Henry should be disallowed.

In his response, Henry acknowledges that HRT's claim for post-petition rent was rendered moot by the Court's 1995 decision. However, he argues that the other claims should be allowed because the Court's decision invalidated the October 1992 agreement, "reinstating" all claims that Henry or his affiliates might have under the January Agreement. Henry further argues that the Objection seeks to improperly group together separate claimants. The Debtor counters by referring to the Mutual Release provision contained in the October Agreement, which effectively grouped all of the Henry Claims together. The Debtor also notes sardonically that the three claiming entities filed a joint response.

Henry alternatively argues that if the $202,000 payment to HRT under the October Agreement must be accounted for, it should be credited toward the $1.1 million that the Court found was owed to Henry as of October 1992 under the January Agreement. *See Sanborn*, 181 B.R. at 686. Further, he asserts that if the Court were to follow the § 502(d) analysis proposed by the Debtor, the $202,000 payment should be considered only in connection with the HRT claim, since the October 1992 agreement was between Sanborn and HRT *only*. In reply, the Debtor reiterates its earlier made point that since the October Agreement contained a global release as between Sanborn and Henry, including their respective affiliates, § 502(d) should apply to all the of the Henry Claims.

### III. *Discussion*

The Court begins with Henry's argument that the Court's 1995 decision leads to the conclusion that "the parties are ... left with their January 1992 agreement which controls the conduct of the parties." Hr'g Tr. at 12. Henry then reasons that the Henry Claims, based on certain provisions in the January Agreement and its accessorial contracts and leases, should be allowed.

However, this argument relies on a faulty premise; namely, that the Court "invalidated" the October Agreement in the 1995 decision.[6] The Court held only that it *would not enforce* the October Agreement. *See Sanborn*, 181 B.R. at 693 ("[T]he Court finds and rules that the October Agreement was made in violation of the [state court] Injunction Order, and, is therefore unenforceable."). On account of the present dispute, the Court is required to go further, and analyze the effect that the 1995 decision had on the previously-filed Henry Claims.

■ Massachusetts courts not only refuse to enforce illegal contracts which have been fully executed, such as this one; they also refuse to "relieve either party from the consequences of his own violation of law." *Eastern Expanded Metal Co. v. Webb Granite & Constr. Co.*, 195 Mass. 356, 362, 81 N.E. 251, 252 (1907) (emphasis added); *see also St. Louis, Vandalia & Terre Haute R.R. v. Terre Haute & Indianapolis R.R. Co.*, 145 U.S. 393, 407, 12 S.Ct. 953, 957, 36 L.Ed. 748 (1892) ("[N]either party to an illegal contract will be aided by the court, whether to enforce it *or to set it aside*.") (emphasis added); *Berman v. Coakley*, 243 Mass. 348, 350, 137 N.E. 667, 668 (1923) ("[A] private agreement made in consideration of the suppression of a criminal prosecution will neither be enforced

---

**5.** That statute provides:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

**6.** Counsel to Henry and his related entities stated at the hearing: "The adversary proceeding, as I understand [the 1995 decision], invalidated the October modification to the January agreement." Hr'g Tr. at 8. Counsel to the Debtor agreed with this statement. *See* Hr'g Tr. at 13 ("I agree with [Henry's counsel] that the Court's decision completely invalidated the October agreement in toto."). They are both wrong.

*nor abrogated* by a court of equity.") (emphasis added); *Brown v. Nealley,* 161 Mass. 1, 3, 36 N.E. 464, 465 (1894) (where they acted in equal fault, "the law leaves the parties where they stand"). "[T]he whole affair is so tainted with illegality that no assistance will be afforded to anybody culpably connected with its executed aspects." *Duane v. Merchants' Legal Stamp Co.,* 231 Mass. 113, 119, 120 N.E. 370, 372 (1918).

There is, however, a "widely recognized" exception to this principle. As stated by the Massachusetts Supreme Judicial Court:

> [W]here the parties are not in equal fault as to the illegal element of the contract, or, to use the phrase of the maxim, are not in pari delicto, and where there are elements of public policy more outraged by the conduct of one than of the other, then relief in equity may be granted to the less guilty.

*Berman v. Coakley,* 243 Mass. at 350, 137 N.E. at 668–69. In order to determine whether this exception applies here, the Court must examine the parties' relative levels of fault.

 The Injunction Order was issued in a state court action to which both Henry (and some of his related entities) and Sanborn were parties, as a defendant and a reach-and-apply defendant respectively. The Court has already found that "all parties were aware of the Injunction Order" and that "the October Agreement was purposefully structured to evade the Injunction Order by funnelling payments to Henry through HRT." *Sanborn,* 181 B.R. at 690. There is no evidence to suggest that one party somehow coerced the other to enter into the arrangement. Further, Henry was the true target of the state court Injunction Order. The Debtor merely colluded with Henry's fraud on the Suffolk Superior Court. Accordingly, the Court finds, based on its previous factual findings and the evidence presented in connection with the 1995 decision, that the parties acted *at least* in pari delicto. If anything, Henry was more at fault, so the above-stated exception does not apply.

Henry's other two arguments, that Henry and his related entities should not be grouped together and that the money paid by Sanborn under the October Agreement should only be credited against debts allegedly owed to Henry or HRT, do not require much analysis. The "grouping" of the claims of the various Henry entities is the result of the global release contained in the October Agreement which Henry negotiated and executed. Henry agreed to release any "claims, debts, demands, action, causes of action, suits, accounts, covenants, contracts, agreements and liabilities" he or any of his "affiliate or subsidiary companies" held against the Debtor.[7]

Thus, the Henry Claims must be disallowed. All four claims arise from provisions of the January Agreement which were modified or terminated by the October Agreement. To allow these claims would be to effectively void the October Agreement, so that the January Agreement was again controlling. Such an action would "undermine the venerable principle that a court should not aid either party to an illegal contract." *Doyle v. Hasbro, Inc.,* 884 F.Supp. 35, 39 (D.Mass.1995). Henry and all of his affiliated entities in existence as of October 1992 are left where they stand.[8]

---

7. In fact, Henry testified that in consideration of the $177,000 payment under the October Agreement, he agreed·to terminate his employment contract and modify the Plaistow Property lease. *Sanborn,* 181 B.R. at 686. As for the CEI claim, CEI was presumably "rolled into" RSI (as the 1991 Letter attached to the claim indicated), which was an expressly-named party to the October Agreement. In any event, it is clear that the CEI claim predates the October Agreement, since the only support Henry attached to the claim is the 1991 Letter. Therefore, the CEI claim is encompassed by the broad language of the global release.

8. With respect to the Court's other holding in the 1995 decision, that HRT came to the Court with unclean hands, it applies equally well here. The clean hands doctrine " 'is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief(4)27' " *Sanborn,* 181 B.R. at 692 (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945)). In the previous decision, the Court held that HRT's claim for post-petition rent (which is also one of the claims at issue here) arose from the Lease Modification Provision of the October Agree-

### IV. *Conclusion*

Accordingly, the Objection is sustained with respect to all four claims addressed therein, and the Henry Claims are disallowed. Further, the counterclaim is deemed withdrawn by the Debtor. A separate order shall enter in conformity herewith.

ment, so that HRT's bad faith was "relative to the matter in which [it] seeks relief." *Sanborn,* 181 B.R. at 692. The post-petition rent claim originated in the lease of the Plaistow Property from January Agreement, but was modified by the October Agreement. Similarly, the other Henry Claims originated in the January Agreement, but were terminated by the Mutual Release provision in the October Agreement. Therefore, HRT's/Henry's "unclean hands" with respect to the October Agreement are just as attributable to Henry's employment contract claim, CEI's claim, and HRT's pre-petition lease claim as they are to HRT's post-petition lease claim.